**Julia A. McLAUGHLIN, by Catherine McLAUGHLIN, Plaintiff,**

v.

**BOSTON SCHOOL COMMITTEE, et al., Defendants.**

**Civ. A. No. 95–11803–WAG.**

United States District Court, D. Massachusetts.

Aug. 29, 1997.

---

## MEMORANDUM AWARDING ATTORNEYS' FEES

GARRITY, District Judge.

Until its dismissal for lack of subject matter jurisdiction on November 19, 1996, this was a civil rights action brought on behalf of Julia McLaughlin, a white twelve-year-old resident of Hyde Park, by her mother Catherine McLaughlin, seeking admission to the seventh grade at Boston Latin School ("BLS"). Julia had not previously attended Boston public schools, having completed the sixth grade at St. Mary of the Hills School, an elementary parochial school in Milton. Plaintiff's complaint was filed on August 11,

1995, by Michael C. McLaughlin, Esq. ("McLaughlin"), Julia's father, for whom she now applies for attorneys' fees as well as for fees for the law firm of O'Brien, Partlow & White, P.C. ("OPW") which handled major aspects of the litigation.

*Background*

Plaintiff's complaint asserted at length a mix of federal and state claims,[1] some of which were later withdrawn or dismissed summarily. The essence of her claim under 42 U.S.C. § 1983 was that she was denied admission to BLS because 35% of the seats in the entering class had been reserved by the defendants for Black and Hispanic students, several of whom were admitted despite having scored lower than plaintiff on the annual entrance examination. The central allegation of the complaint was that the defendants' 35% set-aside for Black and Hispanic applicants violated plaintiff's civil rights under the Equal Protection Clause of the Fourteenth Amendment. Defendants' position was that the classification at issue was narrowly tailored to advance compelling governmental and educational interests and therefore could withstand strict constitutional scrutiny. The nature and resolution of the litigation are described in detail in *McLaughlin v. Boston School Committee*, 938 F.Supp. 1001 (D.Mass.1996), and *McLaughlin v. Boston School Committee*, 952 F.Supp. 33 (D.Mass.1996).

After issuing an order to show cause dated April 17, 1996, the court revisited plaintiff's application for a preliminary injunction. On August 22, 1996, the court ordered preliminarily that the defendants admit plaintiff to the eighth grade when the 1996 summer recess ended and classes resumed for the 1996–97 school year. Trial was scheduled to start on November 19, 1996. The court had denied, at plaintiff's urging, a series of requests by defendants for postponement until after an advisory group, appointed by the Boston School Committee ("BSC") in September 1996,[2] had completed a study of possible alternatives to existing examination school assignment processes and filed a report of its recommendations. On November 14, 1996, the defendants voted to waive any right to reassign plaintiff from BLS, thus making the preliminary injunction effectually permanent. On November 15, 1996, the defendants filed a suggestion of mootness. After briefing and hearing argument, the court found, over plaintiff's opposition, that defendants' suggestion of mootness was timely and dismissed the action for lack of subject matter jurisdiction.

After dismissal, plaintiff filed applications for attorneys' fees pursuant to 42 U.S.C. § 1988, to which the following distinctive features of the case appear to be germane:

1. It was an individual suit, not a class action.

2. Plaintiff was represented by her father, an attorney, and by two other attorneys.

3. Virtually all relevant facts were undisputed.

4. Direct testimony was ordered, with consent of the parties, to be filed in writing months before the trial date.

5. On the eve of trial, defendants voluntarily agreed to keep plaintiff at BLS as long as her grades were satisfactory.

6. Plaintiff did not obtain a judgment, consent decree, or settlement in this action, which was dismissed for lack of subject matter jurisdiction.

The roles of the attorneys for whom plaintiff seeks compensation changed during the pendency of the action. For the first month ("Phase I" of the litigation), McLaughlin was

---

1. The last four pages of the complaint, pp. 17–20, state Counts I–VI and prayers 1–8 and are attached hereto as *Appendix A*.

2. In the spring of 1996, the school superintendent assigned certain staff members to review student assignments generally, including those for the examination schools. The advisory group appointed in September 1996, consisting of ten community leaders and co-chaired by the BSC vice-president and a law school professor, was directed to focus on examination school assignments in light of the court's August 22, 1996, memorandum discussing the 35% set-aside and ordering plaintiff's admission to BLS. The advisory group met frequently and had set a November 20, 1996, deadline for filing its initial recommendations with the BSC.

sole counsel. After the complaint was filed, a partner at the law firm where McLaughlin was counsel contacted Mark A. White, Esq. and asked if he would be interested in becoming involved in the case.[3] White phoned McLaughlin to discuss the matter and on August 28, 1996, attended as a spectator the first hearing on plaintiff's motion for a preliminary injunction. Thereafter McLaughlin met with members of OPW and told them that he was not a trial lawyer and needed experienced trial counsel. On September 11, 1995, White filed his notice of appearance, soon joined by his partner, R. Keith Partlow, Esq. For approximately the next year ("Phase II"), White and Partlow handled virtually all the details of the litigation, culminating in the court's order on August 22, 1996, that plaintiff be enrolled at BLS. They drafted, briefed, and argued every motion and filed and followed up on every discovery request, but had no significant contact with either the real or nominal plaintiff. During this period, McLaughlin's services were confined to reviewing and making some revisions in documents drafted by OPW and attending court hearings, depositions, and conferences, mainly as an onlooker. He also consulted and engaged a husband and wife team of expert witnesses, the Thernstroms.[4] However, McLaughlin's representation of plaintiff occurred primarily in the court of public opinion, explaining to local and national news media[5] the objectives and status of his daughter's lawsuit. A third period of representation ("Phase III") began after August 1996. Several instances arose in which OPW had disagreements with McLaughlin and most, if not all, subsequent motions were

signed solely by McLaughlin, who had decided to become lead trial counsel for the third phase. Working with volunteer law school students, he also briefed and argued plaintiff's unsuccessful opposition to defendants' suggestion of mootness that led to dismissal of the case on November 19, 1996. The period after dismissal until January 9, 1997, the date of the final hearing on McLaughlin's amended application for fees, we refer to as "Phase IV."

### Applications for Fees and Court's Duty

Pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (West.Supp.1997), providing in part that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs," plaintiff applied for attorneys' fees and expenses exceeding $300,000 ($209,418.28[6] for McLaughlin and $93,235.36 for OPW) plus an upward adjustment of an unspecified percentage to reward successful efforts.

The dates to which counsels' services and plaintiff's application for fees principally relate are the following:

*August 11, 1995*—Complaint filed by McLaughlin, the last four pages of which are appended as *Appendix A,* in six counts and seeking declaratory and injunctive relief;

*August 28, 1995*—Hearing on motion for preliminary injunction;

*October 10, 1995*—Hearing on plaintiff's motion for reconsideration;

---

3. White's affidavit dated January 3, 1997, states, "[I]t was explained to me by _____ [partner who on January 2, 1997, filed an affidavit supporting his fee application], that there was a conflict in the firm about the firm's involvement and that Mr. McLaughlin would be allowed to continue in the case if he got outside counsel to represent his daughter." McLaughlin's affidavit of the same date states, "[S]hortly after filing the Complaint and supporting documents in this case, in August, 1995, my relationship with the law firm to which I was 'Of Counsel' was terminated because of my involvement in the above-entitled action."

4. According to his resume, a book by the Thernstroms, *America in Black and White,* is cur-

rently scheduled to be published this year by Simon & Schuster.

5. McLaughlin was interviewed for dozens of national publications and appeared on several national television shows.

6. Subsequent to the December 30, 1996, hearing on applications for attorneys' fees, at which substantial deficiencies in McLaughlin's application were exposed, McLaughlin sought to amend his application on January 10, 1997, and make questionable changes in it; hence the court's analysis pertains to his records both as first submitted and as later changed.

*April 17, 1996—Hearing* on cross motions for summary judgment at which plaintiff's motion was denied and, on defendants' motion, three counts in the complaint were dismissed, as follows: I. claiming violations of plaintiff's rights under the Fifth Amendment; III. claiming violation of unspecified statutes of the Commonwealth of Massachusetts; and VI. claiming a scheme to deceive plaintiff in granting admissions to BLS;

*August 22, 1996—Preliminary injunction* entered ordering plaintiff's admission to BLS;

*November 13, 1996—*Final pretrial conference;

*November 19, 1996—Hearing* on defendants' suggestion of mootness based upon BSC vote on November 14, 1996, permitting plaintiff to remain at BLS; and dismissal for mootness.

In addition to attending the four hearings and final pretrial conference listed, plaintiff's counsel's services included attending eight scheduling conferences and one settlement conference, taking two depositions, drafting the motions heard and preparing exhibits and testimony for the anticipated trial.

■ Defendants have directed a barrage of objections, legal and factual,[7] against the applications. In considering them, the court is obliged to undertake an independent review of the legality and reasonableness of plaintiff's requests. *See Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 529 (1st Cir.1991); *Gabriele v. Southworth,* 712 F.2d 1505, 1507 (1st Cir.1983). As stated in *Foley v. City of Lowell,* 948 F.2d 10 (1st Cir.1991), "at least where public funds are involved or the public interest is otherwise implicated, the court has the duty to consider the application critically to ensure overall fairness...." *Id.* at 19. Both public funds and the public interest are involved here.

The court has carefully reviewed plaintiff's applications critically in light of legal precedents, defendants' numerous factual objections, its own experience, plaintiff's voluminous error-filled submissions, and three hearings on fee applications. Due to deficiencies in plaintiff's initial applications under § 1988, her successive ones for her father became virtually a case of their own, contrary to the admonition in *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), that "[a] request for attorney's fees should not result in a second major litigation."

*"Prevailing Party" under 42 U.S.C. § 1988*

Defendants' response to plaintiff's applications starts with a blanket legal objection which we address first because, if sustained, it would bar plaintiff from recovering any attorneys' fees at all.[8] Defendants submit that plaintiff was not a "prevailing party" as defined by *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). To qualify for recovery of "a reasonable attorney's fee as part of the costs" under § 1988, plaintiff must be a prevailing party within the meaning of that section. Unquestionably, she prevailed in the usual sense of the word, having gained enrollment at the school which had denied her admission. However, the statutory meaning of "prevailing" in § 1988 has been the subject of several Supreme Court opinions of which *Farrar v. Hobby,* argue the defendants, commands the denial of plaintiff's pending applications *in toto.* While acknowledging the relevance of defendants' argument, the court disagrees.

■ The essence of defendants' position in this regard is that the instant case was not decided on the merits but became moot before trial. Hence, plaintiff must rely upon the catalyst theory of recovery, described briefly in the court's Supplementary Memorandum, *McLaughlin,* 952 F.Supp. at 36, and applied in numerous cases in this circuit and

---

7. In this context "legal" refers to objections based on statutory or decisional precedent, as contrasted with "factual" objections based upon alleged inadequacies of records, services performed, market rates of compensation and the like. Some imprecision and overlap is unavoidable.

8. Defendants' other legal objections, of which there are several, pertain only to McLaughlin's application and are considered *infra.*

district. *See e.g., Paris v. United States Dep't of Housing & Urban Dev.*, 988 F.2d 236 (1st Cir.1993); *Pearson v. Fair*, 980 F.2d 37 (1st Cir.1992); *Kerry B. v. Union 53 Pub. Schools*, 882 F.Supp. 184 (D.Mass.1995). As explained in *Paris:*

> To be a catalyst the party must demonstrate (1) a causal connection between the litigation and the relief sought and (2) that the success was not obtained by a gratuitous gesture of the fee-target. The suit need not be the sole cause but must play a "provocative" role or be a "competent producing cause."

*Paris*, 988 F.2d at 241 (citation omitted). Defendants do not contest that plaintiff's suit was a catalyst contributing to her admission to BLS.

Enter *Farrar.* After a review of prior Supreme Court decisions construing the phrase "prevailing party," the Court concluded that under these cases:

> The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him *at the time of* the judgment or settlement. Otherwise the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." *Only* under these circumstances can civil rights litigation effect "the material alteration of the legal relationship *of the parties* " and thereby transform the plaintiff into a prevailing party.

*Farrar*, 506 U.S. at 111, 113 S.Ct. at 573 (emphasis added) (citations omitted). Whether the catalyst theory of recovery survives *Farrar* has produced a division of circuit authority. The question was answered negatively in *S–1 and S–2 v. State Board of Education*, 21 F.3d 49 (4th Cir.1994) (en banc), *cert. denied*, 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); and affirmatively elsewhere.[9] *See also* Joel H. Trotter, Note, "The Catalyst Theory of Civil Rights Fee Shifting After *Farrar v. Hobby*," 80 Va. L.Rev. 1429 (1994). Instead of weighing the weight of authority, we simply state our reasons for concluding that the catalyst theory survives in this district and an award of a reasonable attorney's fee to plaintiff is not barred by that Supreme Court decision.

First, the holding in *Farrar* was that a plaintiff who won nominal damages at trial was a prevailing party, and that the prevailing party inquiry does not depend upon the magnitude of the relief obtained, *Farrar*, 506 U.S. at 112, 114, 113 S.Ct. at 573, 574–75. The Court did not discuss the effect of its holding on the catalyst theory. Therefore, the foregoing excerpt is dictum and is not binding on lower courts.

Second, *Farrar's* repeated concern, emphasized by Judge Wilkinson on behalf of the 7 to 6 *en banc* majority of the Fourth Circuit in *S–1 and S–2*, that a plaintiff who obtained no effectively enforceable relief should not recover an attorney's fee, does not apply to the instant case. Plaintiff did obtain enforceable relief of sorts in the form of the court's ordering plaintiff's admission to BLS over defendants' objection that the order, though called "preliminary," would in effect be permanent. *See McLaughlin*, 938 F.Supp. at 1010.

Third, in decisions subsequent to *Farrar*, no court in this circuit has interpreted that case as abolishing the catalyst theory. On the contrary, the *Paris* and *Kerry B.* cases, *supra*, while not addressing the precise issue raised by defendants' pending objection, awarded fees on the basis of the catalyst theory and cited the *Farrar* case in the course of their opinions. Just recently, in *Williams v. Hanover Housing Authority*, 113 F.3d 1294 (1st Cir.1997), the First Circuit awarded attorney's fees under § 1988, stating that "it is well-settled in this circuit that a § 1983 plaintiff seeking attorneys' fees under § 1988 may establish 'prevailing party' status under a 'catalyst' as well as a 'merits' analysis. *See, e.g., Paris*, 988 F.2d at 241." *Id.* at 1299. Accordingly, the defendants' blanket legal objection is overruled.

**9.** *See Little Rock School Dist. v. Pulaski County Special School Dist. # 1*, 17 F.3d 260, 263 n. 2 (8th Cir.1994); *American Council of the Blind v.* *Romer*, 992 F.2d 249, 251 (10th Cir.1993); *Pembroke v. Wood County*, 981 F.2d 225, 231 n. 27 (5th Cir.1993).

### Lodestar Calculations

Defendants' objections to plaintiff's applications challenge their reasonableness in all respects. The requirements for obtaining awards of attorneys' fees under 42 U.S.C. § 1988 have been well settled since 1983 when the Supreme Court decided *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). From time to time the standard has been refined, *see, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), and it has been described and applied in countless lower court opinions, including many by the United States Court of Appeals for the First Circuit. The customary first step is to multiply the hours reasonably spent on the litigation by the reasonable hourly rate of compensation prevailing in the relevant community for similar services by lawyers of reasonably comparable skill, experience, and reputation. Then, the court evaluates the reasonableness of the hours-times-rate product in relation to the results obtained by plaintiff in the litigation. *See Morgan v. Gittens,* 915 F.Supp. 457 (D.Mass.1996). Also, the court should consider any claim by plaintiff that the product, called the "lodestar,"[10] should be enhanced due to exceptional success. *See Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. *Black's Law Dictionary* contains this definition:

> *Lodestar Rule.* In determining amount of statutorily authorized attorneys' fees, "lodestar" is equal to number of hours reasonably expended multiplied by prevailing hourly rate in community for similar work and is then adjusted to reflect other factors such as contingent nature of suit and quality of representation.

*Id.* at 941 (6th ed.1990).

### White and Partlow

With significant exceptions, the hours recorded by OPW were reasonable and characterized by sound billing judgment. *See Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40. In affidavits appended to their brief filed December 26, 1996, White and Partlow attested to the general accuracy of their claimed hours. Their recitations of services performed are consistent with the progress of the litigation and with the filing deadlines and hearing dates scheduled by the court. In general, the hours claimed accord with the court's opinion as to the time reasonably required to perform the services described and are in many instances corroborated by computer printouts offered by OPW. The hours claimed also indicate an underlying effort to avoid duplication of services. White did most of the talking at court hearings and conferences, and Partlow took the depositions and did most of the brief writing. Finally, the nature of services performed on particular dates is usually described adequately in OPW's time records.

Furthermore, OPW is not seeking compensation for time spent preparing or arguing applications for attorneys' fees. Presumably, when a firm keeps reasonably accurate and contemporaneous records, in keeping with the mandate of *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 951–52 (1st Cir.1984), preparation of an invoice for services is relatively routine and can be accomplished for the most part by secretaries and staff. *See Brewster v. Dukakis,* 3 F.3d 488, 494 (1st Cir.1993); *Jacobs v. Mancuso,* 825 F.2d 559, 563 (1st Cir.1987).

■ Nevertheless, the total compensable hours claimed by OPW are excessive in two respects. First, an unjustifiably large amount of time was spent in connection with plaintiff's motion for reconsideration filed September 22, 1995, which was based on new information, viz., minutes of the school committee meeting on December 12, 1989, concerning a high school student assignment plan supplementing a plan for the lower

---

10. The word "lodestar" was first used by the Supreme Court to describe the *Hensley* formula in *City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). As later explained in *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), "[t]he 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence." *Id.* at 562, 112 S.Ct. at 2641. In briefs supporting their applications and at oral argument, plaintiff's counsel kept misusing the word to signify an upward adjustment of the lodestar figure.

grades already in effect. Its only provisions applicable to BLS were at p. 6, ¶ 3, "for the Latin schools, the admission policies and racial percentage guidelines established by the court will continue to be in effect," and at p. 8, ¶ 5.0, "the present assignment procedure for the three examination schools, established by Judge Garrity, will continue to be in effect." Plaintiff submitted that these provisions were nullified by prior votes of the black members of the committee then in office and therefore the defendants' continuing use of the 35% set-aside was *ultra vires.* On good grounds, defendants characterized the motion as "a frivolous waste of time." Applicant counsel requested compensation totalling $23,530 for time spent in connection with it, including 56 hours by White and 12 hours by Partlow. The court finds that: 1) the new theory stated in the motion was not mentioned in plaintiff's complaint and was "distinct in all respects," *Hensley,* 461 U.S. at 440, 103 S.Ct. at 1943, from plaintiff's constitutional claims; 2) the motion was unsupported factually and legally; and 3) it was denied. In our opinion, the time reasonably spent by OPW on this motion was half the number of hours logged by White and Partlow; 28 and 8 respectively.[11]

■ Second, Partlow's application is further disallowed by half of the unreasonably large amount of time, 63.04 hours, devoted to the cross-motions for summary judgment heard on April 12, 1996. Specifically, 1) Partlow's presentation was a rehash of the relevant part of OPW's argument in support of plaintiff's motion for reconsideration; 2) he continued to endorse Counts I, III and VI of the complaint when he should have known that they were patently without merit; and 3) plaintiff's reply memorandum filed on April 9, 1996, to which Partlow devoted 20 hours, added virtually nothing besides gross hyperbole[12] to the main brief previously filed.

As reduced, we find that total hours reasonably spent by White were 122 and by Partlow 180 and turn now to the issue of reasonable hourly rates.

■ The controlling law is clear and dates back at least to *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). There the Supreme Court stated:

> To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce *satisfactory evidence—in addition to the attorney's own affidavits*—that the requested rates are in line with those prevailing in the community *for similar services by lawyers of reasonably comparable skill, experience, and reputation.* A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

*Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11 (emphasis added). *See also Andrade v. Jamestown Housing Auth.,* 82 F.3d 1179, 1190 (1st Cir.1996). OPW proposed $250 as a reasonable hourly rate for both White and Partlow who filed affidavits stating that $250 is their customary rate for the services they normally render. However, OPW failed to supply the court with the support required by the Supreme Court in *Blum* and later cases. Rather, it filed a compilation of hourly rates from large local law firms that was of no assistance to the court. At the initial hearing on attorneys' fees on December 30, 1996, the court called counsel's attention to

---

11. In light of the court's findings, why is any compensation awarded for this work? Because in briefs and oral argument White and Partlow went beyond the asserted new information and pressed cogent, if rudimentary, arguments for reconsidering the August 28, 1995, order denying preliminary relief, anticipating in some respects the court's decision on August 22, 1996.

12. An excerpt from page 11 indicates the ad hominem tenor of the entire filing:

> This is the last, desperate fall back position of an intellectually bankrupt defense.... Apparently there is no limit beneath which the School Committee will not go in an attempt to make Julia pay for its failure to undertake that which the courts, and the constitution, require. The fact that the School Committee lacks the intellectual honesty to forthrightly discuss, plan for and accommodate the place that race should play in the school admissions process, if any, is a pathetic basis for asserting that "Whatever we might have done, it would still adversely affect Julia McLaughlin." Julia McLaughlin is a young girl whose life has been victimized enough at the hands of this School Committee. Let it stop here.

the absence of the proper proof, viz. affidavits from local lawyers familiar with going rates for similar services by lawyers of reasonably comparable experience. In response, White named a prominent civil rights lawyer who, White expected, would file a conforming affidavit on OPW's behalf. White said that it would be filed within a week; but it never was.

In subsequent filings, including second and third affidavits by both White and Partlow, OPW, on January 3, 1997, filed affidavits by four qualified local attorneys attesting to market rates for work in complex civil litigation including civil rights cases by lawyers of comparable experience, ranging from $200 to $325 per hour. In opposition, a defense affidavit by corporation counsel for the City of Boston stated that the City, in routine civil matters, retains trial lawyers expert in civil rights litigation at an hourly rate of $110; and that in her tenure she never paid more than $175 per hour for civil rights defense. Plaintiff responded that lawyers frequently engaged by a municipality generally reduce their rates for a steady governmental client. This is probably a valid point.

█ In deciding where to place an hourly rate on the spectrum outlined, the court has relied not only on the prevailing market rate but also on three additional considerations: 1) the professional backgrounds and experience of White and Partlow, both first-rate but without prior experience in civil rights litigation;[13] 2) their performance in the case at bar, capable but subject to the criticism, discussed above, as to reasonable numbers of hours; and 3) the twelve traditional factors set forth originally in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir.1974), and discussed in *Blanchard v. Bergeron*, 489 U.S. 87, 91–96, 109 S.Ct. 939, 943–46, 103 L.Ed.2d 67 (1989). In our opinion and finding, the prevailing market rate for the quality and kind of work done by White and Partlow in this litigation, a civil rights case involving significant matters of

law but virtually undisputed facts, is $200 per hour.

█ With further reference to reasonable hourly rates, it is well-settled that different hourly rates are appropriate when the same attorney performs different kinds of work. *See Copeland v. Marshall*, 641 F.2d 880, 892 (D.C.Cir.1980); *Furtado v. Bishop*, 635 F.2d 915, 920–21 (1st Cir.1980). In view of the caution expressed in *Miles v. Sampson*, 675 F.2d 5 (1st Cir.1982), that rates not be graded "in an overly refined manner," *id.* at 9, the relatively broad classifications in *Brewster v. Dukakis*, 3 F.3d 488, 492 n. 4 (1st Cir.1993), distinguishing between "core" and "non-core" services[14] seem preferable, as follows:

> Core work includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring and implementation of court orders. Non-core work consists of less demanding tasks, including letter writing and telephone conversations.

In addition, non-core services also include attendance at court hearings in a non-participatory capacity and conferences with co-counsel. *See Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir.1986); *Ricci v. Key Bancshares of Maine, Inc.* 111 F.R.D. 369, 378–79 (D.Me. 1986); *Refuse & Environmental Systems, Inc. v. Industrial Services of America*, 732 F.Supp. 1209, 1217 (D.Mass.1990). Guided by these classifications, we conducted a thorough analysis of the time records filed by OPW and find that White performed 43 hours and Partlow 51 hours of non-core services. In deciding upon hourly rates of compensation, the most frequently used ratio in this circuit appears to be 3 to 2. In this instance, compensation for non-core services becomes $135 per hour. Plaintiff's claim for OPW expenses of $555 is also allowed.

These findings translate into the following lodestar calculations for OPW's services and expenses:

13. As explained by White at p. 77 of the December 30, 1996, transcript, "We have been consulting with Mr. _____ on a steady basis, because, frankly, we are not Civil Rights lawyers. We never claimed to be Civil Rights lawyers."

14. Referring again to the same consultant, White stated at the December 30 hearing, "But I was not familiar with the issue of core vs. non-core until it was pointed out to me by Mr. _____ and he showed me the case."

White:

| | Hours | Award |
|---|---|---|
| Claimed | 150 @ $250 ($37,500) | |
| Disallowed | 28 | |
| Allowed | 122 | |
| | | |
| Core | 79 @ $200 | $15,800 |
| Non–Core | 43 @ $135 | 5,805 |
| | | $21,605 |

Partlow:

| | Hours | Award |
|---|---|---|
| Claimed | 220 @ $250 ($55,000) | |
| Disallowed | 40 | |
| Allowed | 180 | |
| | | |
| Core | 130 @ $200 | $26,000 |
| Non–Core | 50 @ $135 | 6,750 |
| | | $32,750 |

OPW:

| | | |
|---|---|---|
| Expenses | | $ 555 |
| | TOTAL | $54,910 |

Thus the lodestar calculation for OPW services and expenses is $54,910, rounded to $55,000.

 Next we consider plaintiff's level of success attributable to OPW and whether its award should be reduced because plaintiff achieved only limited success, as argued by defendants. The first and definitive statement of the law in this regard appears in *Hensley* as follows:

> We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Hensley,* 461 U.S. at 440, 103 S.Ct. at 1943. The court finds, with respect to the advocacy on her behalf by White and Partlow, that plaintiff's lawsuit was wholly successful. They focused on her prayer for admission to BLS and, upon achieving that goal, were given secondary roles. In sum, the defen-

dants' argument for reduction of OPW's fees is rejected.

 On the other side of the coin, OPW makes two arguments supporting lodestar enhancement: first that engagement in this litigation precluded employment in others. No doubt it did. However, the law is clear that this factor "is not relevant unless counsel affirmatively establish not merely that they lost business, but that the foregone opportunities would have been more profitable than what the court otherwise would propose to award." *Lamphere v. Brown Univ.,* 610 F.2d 46, 47 n. 2 (1st cir.1979). As stated in *Rogers v. Motta,* 655 F.Supp. 39, 44 n. 2 (D.Mass.1986), "the attorney must convincingly show that the other business would have been more profitable than the court would likely award for his services in the civil rights case." In this instance, applicants have simply submitted conclusory assertions, unconvincing because unsupported by affidavits or anything else in the record.

Finally, OPW seeks enhancement of the lodestar figure because of the exceptional success of this action. It asserts that the results obtained were "distinctly beneficial" due to their "commendable diligence and ability." With this the court agrees. However, although *Hensley* stated that "the important factor of 'results obtained' "may lead the district court to adjust the fee upward," *id.* at 434, 103 S.Ct. at 1940, OPW has not submitted specific evidence which would overcome the strong presumption that the lodestar represents a reasonable fee. *See City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565–66, 106 S.Ct. 3088, 3098–99, 92 L.Ed.2d 439 (1986). The latter case "makes clear that adjustments are not to be given in reward for stellar performance." *Hall v. Ochs,* 817 F.2d 920, 929 (1st Cir.1987). As further explained by the First Circuit, "we have repeatedly cautioned that such enhancements will be rare. The exception is a tiny one—and we will not permit it to eclipse the rule." *Lipsett v. Blanco,* 975 F.2d 934, 942 (1st Cir. 1992) (citations omitted).

Accordingly, plaintiff's request for an enhancement is denied and the court's prior findings as to reasonable fees for White and Partlow in terms of the modified lodestar calculations are affirmed. The award to plaintiff for OPW's services and expenses is $54,910, rounded to $55,000.

### Was McLaughlin Pro Se?

Before discussing several problems raised by McLaughlin's application, we consider defendants' opposition to any award of fees to plaintiff for his services on the grounds that he was representing himself as well as his daughter and was a *pro se* litigant within the meaning of *Kay v. Ehrler*, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991). Plaintiff in that case, which bars fees under § 1988 to *pro se* litigants, was an attorney challenging the constitutionality of a state statute which kept his name off the ballot in a primary election. He prevailed in the case but was denied fees because he represented himself and attorneys are no exception to the general rule that *pro se* litigants do not qualify for the fee-shifting benefits of § 1988.[15] The Supreme Court said "that the overriding statutory concern is the interest in obtaining independent counsel for victims of civil rights violations.... Even a skilled lawyer who represents himself is at a disadvantage in courtroom litigation." *Id.* at 437, 111 S.Ct. at 1437–38.

■ Obviously, the instant case is distinguishable from *Kay* because McLaughlin was on the record representing his daughter, not himself. Defendants rely on two cases applying *Kay* and disallowing attorneys' fees to prevailing plaintiffs: *Rappaport v. Vance*, 812 F.Supp. 609 (D.Md.1993) and *Miller v. West Lafayette Community School Corp.*, 665 N.E.2d 905 (Ind.1996).[16] They also contend that McLaughlin's personal stake in the outcome of the case, including his economic interest in avoiding tuition in private schools comparable to public BLS, and his frequent identification with his family[17] bring him within the rationale of these cited decisions. The court has a different view.

First, unlike the plaintiffs in those cases, McLaughlin was not representing himself. Despite his rhetorical flourishes, he had no constitutional complaint of his own and no standing to bring this action independently. Only the constitutional rights of his daughter plaintiff were at issue. The applicants in the *Kay*, *Rappaport*, and *Miller*[18] cases were suing on their own behalf. The sole plaintiff in *Kay* was himself the attorney applying for fees. *Rappaport* and *Miller* were both actions under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, whose § 1415(b)(2) and (e)(2) confer explicitly upon the parents of a handicapped child the rights to be heard administratively and to bring a civil action. The language in *Rappaport* emphasized by defendants on this question, "because of the close, natural relationship between parent and child, a parent's representation of [his] child is effectively *pro se* representation," appears in a sentence which reads in full as follows: *"Because the language of the statute identifies the parent with the child, and because of the close natural relationship between parent and child, a parent's representation of a disabled child is effectively pro se representation."* *Rappaport*, 812 F.Supp. at 612 (emphasis

---

**15.** Ordinarily, each party to litigation bears the expense of its own legal fees. However, to encourage certain types of lawsuits, Congress has enacted numerous statutes providing that the reasonable costs of counsel incurred by a plaintiff who wins that type of lawsuit may be shifted to the defendant.

**16.** Defendants also cite *Spangler v. Pasadena City Bd. of Educ.*, 384 F.Supp. 846 (C.D.Cal.1974), but that case was decided before *Kay*, on different grounds and under different circumstances.

**17.** *See, e.g.,* transcripts of hearings on August 28, 1995, at 8, "the wrong road for myself and my family"; October 11, 1995, at 33, "the plaintiff which is essentially one family"; and November 19, 1996, at 26 "if I didn't have damages, but surely we do."

**18.** We mention *Miller* only in passing because it did not discuss the pending issue beyond quoting the state trial court's conclusion that "by acting on behalf of his son in providing legal services in a matter *under the IDEA,* the student's father was acting on his own behalf as well and is factually and legally a pro se litigant and not entitled to fees,'" *Miller*, 665 N.E.2d at 906 (quoting trial court record at 89) (emphasis added), and stating, "we agree with the reasoning in *Rappaport* and reach a similar result." *Id.* at 907.

added). The statute controlling here, 42 U.S.C. § 1988, contains no such identifying language. Moreover, *Rappaport* carefully avoided extending the term *"pro se"* to include situations where parents represent their children; instead it drew an analogy, stating at the end of the same paragraph, "the parent's representing the child in administrative proceedings is *analogous* to the parent representing himself." *Rappaport,* 812 F.Supp. at 612 (emphasis added).

In addition, no precedent known to the court has held that a lawyer who represents his child is acting *pro se.* Perhaps sufficient reasons exist for enactment of a rule to that effect, such as the advantages of obtaining independent counsel and the danger of emotion overcoming reason, in line with the opinion of the Supreme Court in *Kay.* However, this court is not the appropriate authority for promulgation of such a rule. Nor would this be an appropriate case. Before filing the complaint, McLaughlin tried unsuccessfully to enlist other lawyers to represent his daughter. But for his readiness to proceed personally, plaintiff's complaint might never have been filed and her enrollment at BLS never achieved.

Hence *Kay* is inapplicable and does not bar plaintiff from recovering a reasonable attorneys' fee for her father under § 1988. However, McLaughlin's application is objectionable in several other respects. One is its inclusion of invoices totalling $31,132 addressed to him by non-lawyers whom he engaged to assist him. A summary of the applicable law follows.

### Costs and Expenses

■ Fee shifting under 42 U.S.C. § 1988 is part of cost-shifting, which antedates fee-shifting and has a federal legislative history highlighted by the 1853 Fee Act, 28 U.S.C. § 1920 (West Supp.1997). "The sweeping reforms of the 1853 Act have been carried forward to today, 'without any apparent intent to change the controlling rules.'" *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 440, 107 S.Ct. 2494, 2496, 96 L.Ed.2d 385 (1987) (citation omitted). In the area of cost-shifting, *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (*"WVUH"*), is as central to our analysis as are the *Farrar* and *Kay* cases in previous sections. It stated that the word "costs" under § 1988 means the same as in 28 U.S.C. § 1920, *WVUH,* 499 U.S. at 87 n. 3, 111 S.Ct. at 1141 n. 3, viz., out-of-pocket expenses *"actually paid* in prosecuting or defending an action," *United States v. Spann,* 797 F.Supp. 980, 981 (S.D.Fla.1992) (emphasis added), or *"incurred* by the attorney." *Northcross v. Board of Educ.,* 611 F.2d 624, 639 (6th Cir. 1979) (emphasis added). 28 U.S.C. § 1920 provides in part that a court "may tax as costs ... (3) Fees and disbursements for printing and witnesses" and 28 U.S.C. § 1821(b) provides in part, "[a] witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance...." Most important in this case, "these provisions define the full extent of a federal court's power to shift litigation costs absent express statutory authority to go further." *WVUH,* 499 U.S. at 86, 111 S.Ct. at 1140–41.

■ The statute supporting plaintiff's pending application is 42 U.S.C. § 1988(b) which provides: "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." Decisions applying § 1988 have allowed reimbursement of certain costs in addition to the six categories listed in 28 U.S.C. § 1920 because they were within the meaning of the term "reasonable attorney's fee," *see, e.g., Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989), in which the Court "concluded that § 1988 permitted separately billed paralegal and law clerk time to be charged to the losing party." *WVUH,* 499 U.S. at 99, 111 S.Ct. at 1147. If customarily billed directly to the client and shown to have been incurred reasonably and necessarily, other out-of-pocket expenses may also be recoverable within the meaning of "attorney's fee." *See Deary v. City of Gloucester,* 789 F.Supp. 61,

68 (D.Mass.1992), *aff'd,* 9 F.3d 191 (1st Cir. 1993) (quoting *Doe v. Crestwood,* 764 F.Supp. 1258, 1262 (N.D.Ill.1991)); *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 825 F.Supp. 361, 367–68 (D.Mass.1993). Other types of expenses are not recoverable because "considered part of the overhead included in counsel's fee," *Jacobs v. Mancuso,* 825 F.2d 559, 563 (1st Cir.1987), i.e., "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate," *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986), and are not recoverable under § 1988. These include work done by administrative staff, *see Jacobs,* 825 F.2d at 563, and secretarial services, *see Wagenmann v. Pozzi,* No. CIV.A.79–1658–F, 1986 WL 11754, at *7 (D.Mass. Oct.17, 1986), *aff'd,* 829 F.2d 196 (1st Cir.1987); *Alexander S. v. Boyd,* 929 F.Supp. 925, 939 (D.S.C.1995).

However defined or billed, controlling statutes and precedents do not permit transfer to the defendants of liability for claimed "costs" not yet paid by plaintiff but presumably owed to nonlawyers engaged by her father to work with him. As a matter of law, the court has no discretion with respect to disallowance of these claims. They are nevertheless described in detail because of their relevance to the court's lodestar rulings.

### $17,082 for Student Volunteers

Plaintiff's application includes a bill for $17,082 addressed to McLaughlin and dated November 21, 1996, from six Suffolk University Law School students. It lists 949 hours of research and other services at $18 per hour. Plaintiff's application also encloses a letter dated November 21, 1996, from the school's manager of marketing, responding to an inquiry from McLaughlin regarding law clerk salaries, and suggesting compensation in the range of $15 to $20 per hour. Robert Roughsedge, leader of the student group, had contacted McLaughlin in September

1995, and offered to help. The students received no course credit or faculty supervision for any of their work. They had no agreement with McLaughlin regarding compensation and decided to bill him, with his approval, only after concluding from decisions found in their research that law clerk time was compensable. They had kept no contemporaneous records, but were able to reconstruct the dates and activities listed in the invoice by referring to their appointment books and personal records and to Lexis and Westlaw printouts which showed the dates of their access.

McLaughlin produced at the hearing on fees on December 30, 1996, a cardboard carton of Lexis and Westlaw printouts of decisions obtained by the students and delivered to him. At the hearing, Roughsedge described conferences with plaintiff's counsel and offered copies of four legal memoranda, totalling 23 pages, submitted to McLaughlin and OPW.[19] According to their invoice, the students also researched "court proceedings in the Hopwood case," referring to *Hopwood v. Texas,* 861 F.Supp. 551 (W.D.Tex.1994), *rev'd,* 78 F.3d 932 (5th Cir.1996), in which plaintiff's expert Thernstrom had testified for the *Hopwood* plaintiff-appellant; and had a "conference call with Hopwood attorneys." They helped McLaughlin prepare to cross-examine defense expert Professor Charles Vert Willie ("Prof.Willie") by researching his "past reports, books, articles." Roughsedge testified that he "read thoroughly and highlighted and tabbed" three books Prof. Willie had written[20] and that other students went off to various libraries throughout the city to find publications by Prof. Willie.

The students made two major contributions. First, they drafted plaintiff's response to the suggestion of mootness filed by the defendants on Thursday, November 15, 1996. OPW had more or less dropped out of the case by then, except for trial assignments to cross-examine some defense witnesses whose

---

**19.** White's affidavit dated January 3, 1996, states that "a group of Suffolk Law students did contribute some research, but this office, upon review of same, declined to use much of it and conducted our own research."

**20.** At the December 30, 1996, hearing on fees, McLaughlin stated, "I did the reading of every book that Mr. Willie has written, including not only the three provided to me, but I read every one that I could find, because I had to be ready."

direct testimony would be in written form, and McLaughlin called upon the students to fill the breach. , This they did admirably, four of them producing a brief in opposition which the court, at the November 19, 1996, hearing on mootness, called "very scholarly." Roughsedge and two other students each worked with McLaughlin for 36 hours over the preceding weekend: Friday from 3:00 p.m. to midnight and Saturday all day until 3:00 a.m. Sunday morning. Second, they minimized plaintiff's costs. According to plaintiff's reply memorandum filed December 26, 1996, at p. 15, "the use of law school students ... in fact did defray tens of thousands of dollars in Attorney McLaughlin's research, including copying, etc. The justification for using law school students was obviously to minimize costs."[21] No doubt, the bulk of the expenses defrayed would have been in the area of salaries for junior associates and paralegals; and yet the cost of all the computer printouts obtained by the students would seem also to have been substantial.

 Allowance of the Suffolk Law students' bill as a cost of plaintiff or otherwise is denied because they were volunteers and were paid nothing. Where a plaintiff applies for fees for work performed by non-lawyers, any award for this work is limited to the amount of money actually paid to them. *See Lamphere v. Brown Univ.*, 610 F.2d 46, 48 (1st Cir.1979); *NAACP v. Detroit Police Officers Association*, 620 F.Supp. 1173, 1194 (E.D.Mich.1985) (citing *Lamphere* ). "[H]ours of time donated by law students and other local volunteers" is not compensable. *Hart v. Bourque*, 608 F.Supp. 1091, 1093 (D.Mass.1985), *rev'd on other grounds*, 798 F.2d 519 (1st Cir.1986). Services of legal interns are considered part of the overhead

of plaintiff's counsel. *See Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 949 (1st Cir. 1984).

#### *$14,050 for Stephan Thernstrom*

Had the case gone to trial, plaintiff's case-in-chief would have consisted entirely of stipulations of undisputed facts and documentary exhibits to which defendants had no objection. Plaintiff's only live testimony would have been in rebuttal of defendants' evidence. As part of pretrial discovery, plaintiff filed on March 11, 1996, a designation of plaintiff's expert witnesses including a list of 19 aspects of defendants' anticipated expert testimony, already disclosed in previously filed reports of Prof. Willie and Dr. Susan Ellerin, that plaintiff's experts would refute.

The experts named in plaintiff's designation were Professor Stephan Thernstrom ("Prof.Thernstrom") and his wife, Dr. Abigail Thernstrom, both highly qualified. Prof. Thernstrom is the Winthrop Professor of History at Harvard University, whose resume lists eight books and 53 articles, chapters and reviews, and qualification as an expert witness in eleven federal court cases, ten of them brought under the Voting Rights Act and the other a successful challenge to the admissions policies of the University of Texas Law School, *Hopwood v. Texas, supra*, holding that the defendant "may not use race as a factor in law school admissions." *Id.* at 935. As for Dr. Abigail Thernstrom, plaintiff's designation refers to her as "a nationally recognized authority on affirmative action." Her countless publications, board memberships[22] and media interviews would seem to support a reference to her as a nationally recognized authority on opposing affirmative action. While the expert report

---

**21.** Presumably plaintiff herself was unmindful of the restriction customarily appended by Westlaw and Lexis to printouts of syllabi and decisions supplied at nominal rates to law schools for use by their students: "For educational purposes only" or language to that effect. Whether her attorneys were similarly unaware and whether in fact such a restriction was appended to the printouts delivered by the students, did not appear.

**22.** Dr. Abigail Thernstrom's resume lists 14 committees and boards of which she is, or was in March 1996, a member. With three of them, the

Center for Education Reform, the Institute for Justice and the Pioneer Institute, McLaughlin had "lengthy discussions" when "contacting various organizations for legal and/or financial assistance in order to bring this law suit." (McLaughlin's Aff. filed Jan. 3, 1997.) He received no such assistance. A fourth, the Center for Equal Opportunity is mentioned in McLaughlin's time charges for March 4, 1996: "Call from the Thernstroms, call to Mr. Reynolds at Center for Equal Opportunity; discussions with K. Partlow."

and prospective rebuttal testimony were Prof. Thernstrom's, the entries in McLaughlin's time charges regarding experts refer at first only to Dr. Abigail Thernstrom and then to the Thernstroms jointly,[23] *see, e.g.,* "Meeting with the Thernstroms and plan strategy" dated February 29, 1996. Their last reference to her was on March 19, 1996: "Meet with Abigail Thernstrom and review bills."

Prof. Thernstrom's services are listed in his invoice addressed to Michael McLaughlin dated November 20, 1996 (attached hereto as *Appendix B* ). Those from February 10 to March 18, 1996, refer to his research and drafting of a critique of Prof. Willie's report, conferring with McLaughlin and drafting and revising his own report which was filed on March 19. Except for an entry on April 22, 1996, for "discussing court order and drafting memo," there came a seven-month hiatus in his services until a phone conversation with McLaughlin on October 28, 1996. Prof. Thernstrom's services during the next month were mainly assisting McLaughlin in recasting his expert report filed on March 19, 1996, into another format of 154 separate paragraphs [24] entitled "Testimony of Plaintiffs' Expert Professor Stephan Thernstrom" and signed by him on November 12, 1996, when McLaughlin drove it up to his home in Lexington.

It was an odd exercise, whose purpose eludes us. The details of the undertaking appear in Prof. Thernstrom's invoice [*Appendix B* ] for 11–10, 11–11, and 11–12 and in McLaughlin's billing entries filed with plaintiff's application from which the following excerpts are copies:

11/10/96 MCM ... CONF. WITH PROF. THERNSTROM ... DRAFTING AND REVISING PROF. THERNSTROM'S EXPERT TESTIMONY; WORK WITH CHERYL [25] ...

11/12/96 MCM ... REVIEW TESTIMONY AND CALL TO STEPHAN THERNSTROM; CONF. WITH PROF. THERNSTROM; DRIVE TO THERNSTROM'S HOUSE AND REVIEW EXPERT TESTIMONY ... WORK LATE WITH CHERYL REVISING THERNSTROM EXPERT. REVISIONS, DRAFTING

11/10/96 CAL DRAFT, REVIEW, REVISE, ETC. EXPERT TESTIMONY WITH MICHAEL

11/12/96 CAL WORK LATE, REVISIONS TO EXPERT TESTIMONY

A close comparison of the expert report filed on March 19, 1996, and the so-called Testimony of Plaintiffs' Expert filed on November 18, 1996, shows that they are practically identical in structure and, more often than not, in phraseology. Except for eliminating "Personal Background" attaching a curriculum vitae to the report, the subheadings are identical. Even the rhetorical questions and exclamation points are the same. Moreover, several parts of the expert report are surprisingly personal to the plaintiff. For example, at page 9 it states:

> Professor Willie wants to "level the playing field for Public School Students." This is a new and novel reason for justifying race-based quotas. It is in effect a decision to *punish private school children of tax-paying residents* for being sent to "better" schools, and the decision to punish them is being made by the authorities in charge of the inferior school system. And since so many private school students in Boston are enrolled in parochial schools, there might be a question as to whether such a policy discriminates against families with particular religious commitments.

---

**23.** At one of their meetings, it was decided that Dr. Abigail Thernstrom, who on January 24, 1996, had been appointed to the Massachusetts Board of Education, would not testify at trial.

**24.** Most of the paragraphs are single, declarative sentences copied verbatim from, and in the same order as, Prof. Thernstrom's report.

**25.** "Cheryl" and "CAL" are Cheryl A. Lannan, McLaughlin's office manager and secretary since 1993.

McLaughlin's time charges for February and March 1996 and entries in Prof. Thernstrom's invoice to McLaughlin also indicate the extent of McLaughlin's contribution to Prof. Thernstrom's initial report. Apparently, the core of Prof. Thernstrom's report was his critique, drafted on February 13, 1996, of a Prof. Willie report filed the week before. After conferences with Prof. Thernstrom on February 29 and March 9, 1996,[26] McLaughlin drafted an expert witness report on March 10 and 11, 1996, and revised it jointly with Prof. Thernstrom until it was filed on March 19, 1996. McLaughlin's participation is confirmed in Prof. Thernstrom's affidavit dated January 2, 1997, which describes their "close collaboration" and states that "his input was invaluable to my testimony." Finally, certain typographical errors, colloquialisms, hyperboles, and rhetorical questions strongly reflect the writing style evidenced in other filings by McLaughlin on plaintiff's behalf. In sum, its seems that McLaughlin wrote the report which Prof. Thernstrom signed.[27]

■ Plaintiff's application for $14,050 for Prof. Thernstrom is denied because expert witness fees are not recoverable in suits under 42 U.S.C. § 1983 and Prof. Thernstrom did not testify. In a Title VII case decided in 1987, *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987), the Supreme Court held that "absent explicit statutory or contractual authorization," [28] federal courts cannot award the prevailing party in a civil action more than $40 per day of testimony for an expert witness. Four years later, citing a Title VII plaintiff's need for testimony from economists, statisticians, and workplace experts, see H.R. REP. No. 102–40(I), at 77–79 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 615–17, Congress overruled *Crawford Fitting* in a section of the Civil Rights Act of 1991, Pub.L. No. 102–166, § 113(a)(2), 1991 U.S.C.C.A.N. (105 Stat.) 1071, 1079 (codified as amended at 42 U.S.C. § 1988(c) (1994)), and enacted 42 U.S.C. § 1988(c) providing that the court, in its discretion, may include expert fees as part of the attorneys' fees in actions under § 1981 and § 1981(a). This is not such a case; and no similar provision has ever been enacted for actions brought under § 1983.

Additionally, Thernstrom's failure to testify is also dispositive. "None of the categories of expenses listed in § 1920 [of Title 28] can reasonably be read to include fees for services rendered by an expert employed by a party in a nontestimonial advisory capacity." *WVUH*, 499 U.S. at 87, 111 S.Ct. at 1141. *See also Data Gen. Corp. v. Grumman Systems Support Corp.*, 825 F.Supp. 361, 366 (D.Mass.1993) ("[E]xpert witness fees in excess of the statutory [amount] established by 28 U.S.C. §§ 1920 and 1821 are not recoverable under federal law."); *Deary v. City of Gloucester*, 789 F.Supp. 61, 67–68 (D.Mass.1992) ("[A]n attorney cannot recover expert witness fees, except to the extent that they fall within the $40–per–day fees for witnesses provided by 28 U.S.C. §§ 1920(3) and 1821(b)."); *Haberern v. Kaupp Vascular Surgeons, Ltd.*, 855 F.Supp. 95, 100 (E.D.Pa. 1994) (limiting the expert witness fee to $40 per day of trial attendance under *WVUH*), *aff'd*, 65 F.3d 162 (3d Cir.1995).

### $2,850 For Cheryl Lannan

A third nonrecoverable inclusion in McLaughlin's application is 38 hours worked on the case by his secretary and office manager, Cheryl Lannan, billed at the rate of $75 per hour. Fees for work done by secretaries and administrative staff are not compensable under § 1988. McLaughlin sometimes referred to Ms. Lannan as also a paralegal, but there was no showing by anyone of any

---

**26.** Incidentally, Prof. Thernstrom's bill lists two hours for the conference on March 9, 1996, while McLaughlin's diary lists four hours.

**27.** Note well: the court does not make a finding of fact on this point since the parties have never been heard on the question and since it is unnecessary to the purpose of our analysis which is not a critique of Prof. Thernstrom's methodology nor of the cogency of the opinions expressed in his report, but rather an important factor in assessing the reasonableness of the number of hours logged by McLaughlin after the August 22, 1996, order admitting plaintiff to BLS.

**28.** Plaintiff has not claimed any contract with any defendant, nor is there any evidence of one. Prof. Thernstrom's invoice is addressed to Michael McLaughlin only.

training or activity that would qualify her for the compensable classification.

### Summary and Consequences

On the various grounds stated, the inclusion in plaintiff's application of claims for sums due the student volunteers, Prof. Thernstrom, and Ms. Lannan totalling roughly $34,000 ($33,982) is contrary to law and is rejected as a matter of law. Does this overreaching by plaintiff amount to a "special circumstance" within the meaning of *David v. Travisono,* 621 F.2d 464, 468 (1st Cir.1980), thereby "rendering plaintiff[s] undeserving of a fees award"? Not in our opinion, because McLaughlin probably is not conversant with the controlling statutes and decisions. Regarding the students' invoice, while the students knew of the *Lamphere* case, they completely misconstrued it; and the Westlaw and Lexis printouts, when forwarded to McLaughlin, may not have carried the telltale restriction. As for the Prof. Thernstrom invoice, while the limited scope of § 1988(c) is definite, experienced defense counsel made no reference to it in responding to McLaughlin's application. Most lawyers probably assume erroneously that the Civil Rights Act of 1991 overruled *Crawford Fitting* generally instead of selectively, i.e., with respect only to §§ 1981 and 1981(a). Regarding such special circumstances, other features of McLaughlin's application raise closer questions.

### Special Circumstances

 Although § 1988 confers discretion on the court by providing that "the court, in its discretion, may allow" attorneys fees, and it is obvious that " 'may' sometimes means 'won't'," *Lynchburg Foundry Co. v. Patternmakers League of North America,* 597 F.2d 384, 387–88 (4th Cir.1979), such freedom of choice is by no means unlimited. The principle is stated in *Travisono,* as follows:

> While it is true that the district court has "broad discretion" to make an initial determination of the entitlement of a prevailing plaintiff to attorneys' fees under the Act, *see Sargeant v. Sharp,* 579 F.2d 645, 647 (1st Cir.1978), that discretion is limited by

the fact that "a successful plaintiff 'should ordinarily recover an attorney's fee *unless special circumstances* would render such an award unjust.' " [ (*quoting Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)) (emphasis added).]

*Travisono,* 621 F.2d at 468. The issue framed by the negative qualification is not how much, but whether. Certain critical factors have been discussed in several opinions in this Circuit, most recently in *Williams v. Hanover Housing Authority,* 113 F.3d 1294, 1301 (1st Cir.1997):

> In this circuit, "special circumstances" warranting a denial of attorneys' fees under § 1988 ... exist where the fee application reflects "(1) no 'good faith' effort to exclude excessive, redundant, or otherwise unnecessary hours, (2) no reduction for time spent on unsuccessful claims, and (3) no allowance for the limited degree of success' achieved by the plaintiff."

*See also Domegan v. Ponte,* 972 F.2d 401, 419–20 (1st Cir.1992) and *Lewis v. Kendrick,* 944 F.2d 949, 958 (1st Cir.1991). Thus, the first question to be addressed in ruling upon McLaughlin's application for fees and expenses totalling $209,418.28 becomes: apart from the $34,000 disallowed by previous rulings, is the overreaching for fees in McLaughlin's application so extreme as to warrant its rejection *in toto?* After describing pervasive deficiencies in McLaughlin's record-keeping and application, the court discusses the *Williams* factors separately.

 Copies of McLaughlin's invoices, all dated either April 30 or November 26, 1996, were included in "Plaintiffs' Memorandum in Support of ... McLaughlin's Application for Attorneys Fees," filed December 13, 1996. An appendix to defendants' opposition filed December 23, 1996, included an analysis of inconsistencies among the applications of plaintiff's three attorneys. It showed that McLaughlin claimed eleven meetings with White or Partlow, consuming 28.8 hours, that were not reflected in White or Partlow's applications, which the court has already determined to be reliable, based on grounds discussed *supra.* McLaughlin also logged numerous conferences and phone calls not

recorded by White or Partlow. Additionally, defendants objected to the lack of detail in McLaughlin's descriptions of his services and the seemingly exorbitant dollar amounts he claimed in several entries.[29]

The inconsistencies noted and defendants' general objections led to a second major litigation culminating on January 10, 1997, with plaintiff filing a so-called "Motion to Amend and Correct Attorney Michael C. McLaughlin's Time Entries and Billings for 1995, 1996 and to include 1997." The motion and supporting memorandum sought to change time charges claimed in McLaughlin's initial application on no fewer than 36 dates. Amendments were proposed under four columns of entries headed "Time Entry Date," "What Is On Billing Submitted to this Court," "What Should Be On Billing Submitted to this Court," and "The Hourly Difference". They demonstrate that McLaughlin's application and memoranda filed on December 13 and 26, 1996, were riddled with errors and were probably never reviewed either by himself or by Ms. Lannan.

McLaughlin's January 10, 1997, motion identified 53.3 hours included in his invoices, for which compensation of $13,325 had been claimed, which he no longer claimed to have been spent on the case. Some changes were made without explanation. Others were attributed to the inability of the "transcriptionist" to read correctly longhand of figures and decimal points, computer-generated duplicate entries and duplicate time entries. However, McLaughlin's elimination of 53.3 hours from those previously claimed did not result in a reduction in his bill for services. His review claimed 23.9 hours which had not been claimed in his initial application, some hours added on further consideration, e.g., 9.20 hours spent with news media, and others added to correct transcribing errors and scrambled dates. But the difference of 29.4 hours (53.3–23.9) hours did not shrink his total of hours claimed because it was offset by 29.5 hours of fee application time, 6.4

hours spent preparing his initial application and attending the December 30, 1996, hearing, and the other 23.1 hours logged for time spent replying to defendants' opposition. The net effect was to increase McLaughlin's time by one-tenth of an hour and his final invoice by $25.

Even the 1997 revisions are demonstrably inflated. McLaughlin's initial application recorded a 7.3 hour meeting on September 18, 1995, with White, which was not included in White's application; the revision omitted a description of any such meeting, but not the $250 hourly charge for it. Similarly for September 19, 1995, the McLaughlin application was inconsistent with White's as to a 2.7 hour item; the inconsistency was cured by omitting a description of services from the revision, but not the charge. The overbilling for those two dates totals $2,500. Overcharges for 1996, still uncorrected except by defense counsel and verified by the court, relate to charges on October 18, 1996, and November 13 and 18, 1996, totalling 2.5 hours or $625 claimed; and were due to duplicating in the revision charges already included, but out of chronological order, in McLaughlin's initial application.

■■■ The gross unreliability of McLaughlin's successive applications, implicitly conceded in his motion to amend, is aggravated by the lack of detail in his descriptions of services rendered. At a minimum, it handicaps the court in meeting the expectations of reviewing courts as explained in *United States v. Metropolitan District Commission*, 847 F.2d 12, 16 (1st Cir.1988):

> Although there is "some burden on the court to explain why it makes a substantial adjustment, up or down, of a diary-supported bill," *Jacobs v. Mancuso*, 825 F.2d 559, 560 (1st Cir.1987), we have "never required that [district] courts set forth hour-by-hour analyses of fee requests." *Id.* at 562. What we expect the trial court to do is make concrete findings, *id.* at 560,

---

**29.** At the December 30, 1996, and January 8 and 9, 1997, hearings, McLaughlin produced his original time records, a separate diary he kept on this case for 1995 and a 1996 diary in which entries for this and other engagements had been recorded. After photocopying by defense counsel on January 8, the 1995 diary has been retained by the court, to be returned to McLaughlin with a copy of this memorandum of decision. The 1996 diary was examined at McLaughlin's office by defense counsel on January 9, after the hearing.

supply a "clear explanation of its reasons for the fee award," *Grendel's Den*, 749 F.2d at 950 (quoting *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941); and most of all, "retain a sense of overall proportion." *Gabriele*, 712 F.2d at 1507.

Counsel's correlative obligation is "to maintain detailed time records, wherever practicable clearly delineating the particular claims and issues to which the legal services related." *Domegan*, 972 F.2d at 423. In McLaughlin's records, "particular claims and issues" were seldom referred to and services rendered were usually described without details.

■ In sum, while McLaughlin's departures from well-defined standards governing applications for attorney's fees may not in themselves constitute a "special circumstance" warranting a complete denial of fees, they invite consideration of the solution adopted by Judge Aldrich in *Hart*, 798 F.2d at 523 (1st Cir.1986): "Under these circumstances, the real test cannot be the number of hours logged, but what was done." *See also Ackerley Communications v. City of Somerville*, 901 F.2d 170, 171–72 (1st Cir. 1990): *Foley v. City of Lowell*, 948 F.2d 10, 20 (1st Cir.1991). The circumstances in the instant case also include the existence *vel non* of the *Williams* factors, to which we now turn.

### *Excessive, Redundant, or Unnecessary Hours*

■ As with so many principles governing the award of attorney's fees in civil rights litigation, the first of the three *Williams* factors defining the existence of "special circumstances" is derived from *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983), which states:

> Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here."

The good-faith effort required of counsel refers to paring down fee requests prior to filing an application for fees, *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819, 830 (D.Mass.1987), in order that the number of hours for which fees are sought be reasonable. *See City of Riverside v. Rivera*, 477 U.S. 561, 570 n. 4, 106 S.Ct. 2686, 2692 n. 4, 91 L.Ed.2d 466 (1986). Nothing in the record of these proceedings indicates that McLaughlin made any effort at all to comply with this requirement. Only when particular entries were challenged by the defendants and after the discovery of his original records did he undertake an effort, not so much to exclude excludable hours but to buttress his initial application.

A cogent example is McLaughlin's response to the defendants' objection to charges for time spent with news media. The law on this point also stems from *Hensley*, which permits an award only for hours expended "on the litigation." *Id.* at 433, 103 S.Ct. at 1939. Reported federal cases are unanimous in denying awards of attorneys' fees for media-related time to individual civil rights plaintiffs. *See, e.g., Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 176 (4th Cir.1994); *Knight v. Alabama*, 824 F.Supp. 1022, 1034 (N.D.Ala.1993). Even where "communication with the press in [a] matter of great public interest was necessary and appropriate ... it does not follow that everything that counsel has done to further public understanding or which related to the issues presented by the suit is time 'expended on the litigation.'" *United States v. Yonkers Bd. of Educ.*, 118 F.R.D. 326, 330–31 (S.D.N.Y.1987).

McLaughlin's reaction to defendant's opposition to his charging for press dealings appears to be the exact opposite of the effort urged by *Hensley*. Defendants had complained about his entry for August 14, 1995: "numerous calls from press, 8.30 hours—$2,075" and McLaughlin's January 10, 1997, amendment stated "8.00 hours of this should not be billed and is in error." However, he did not leave it at that, but revised his charges for September 18, 19 and 20, 1995, so as to include 9.20 hours for time with the press not previously billed.

Generally speaking, defendants' objections in briefs and at the December 30, 1996, hearing targeted whole areas of McLaughlin's application which were ripe for a good faith effort by him to exclude excessive, redundant, or otherwise unnecessary hours. The effort called for was not principally to see whether the hours charged were actually spent, but whether they were compensable under § 1988 because spent on the litigation, and whether reasonably spent. For example, four and a half months elapsed between the first entry in his separate 1995 diary, on March 27, 1995, and the filing of the complaint on August 11, 1995. During that period 186.5 hours [30] on 50 dates were recorded, many reflecting preliminary inquiries about BLS admissions policies. The first reference to the legal underpinning of plaintiff's claims, the *Adarand* and *Jenkins* cases, came on June 13, 1995. On August 1, 1995, he sent a copy of the first draft of the complaint to Mayor Menino's chief of staff and had several discussions with him before making final revisions. The issue presented is clear: with respect to the award sought by McLaughlin for services rendered before he filed the complaint, did he make the effort to exclude required by *Hensley, City of Riverside,* and other decisions when given obvious opportunities to have done so: first, in December 1996, when preparing his initial application; and second, in January 1997, when reviewing the initial application in light of the defendants' objections and deciding to stand pat, i.e., to make no exclusions, except mathematical corrections, in response to their objections.

The same questions apply to other segments of McLaughlin's application. These include: (a) charging principal counsel fees for occupying the third seat at court hearings after OPW filed appearances and were arguing all motions. "[T]he time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.'" *Hart,* 798 F.2d at 523; (b) invoicing 15 hours for his own time and 7.5 of Ms. Lannon's for rewriting Prof. Thernstrom's report,[31] which we have described *supra* as "an odd exercise, whose purpose eludes us"; (c) soliciting and preparing, in response to the defendants' objection to the complete absence of affidavits in support of his application filed on December 13, 1996, eleven separate affidavits from area counsel attesting to his customary hourly rate of $250.[32] *See Jacobs v. Mancuso,* 825 F.2d 559, 563 (1st Cir.1987) (reducing a fees application because counsel filed five such affidavits "when no more than two, barring unusual circumstances, would seem sufficient").

By far the largest number of arguably unnecessary hours cited by defense counsel concerned trial preparation by McLaughlin for his representation of plaintiff at the trial. Direct testimony of the defendants' experts would be in writing, already filed. In rebuttal, plaintiff filed the testimony of her expert, Prof. Thernstrom, sharply critical of Prof. Willie's report and testimony.[33]

McLaughlin planned to cross-examine Prof. Willie and, at the December 30, 1996, hearing, described his preparation for this confrontation. He obtained from the BSC all

---

**30.** This is our total of entries in McLaughlin's separate diary during that period. His January 10, 1997, motion to amend listed errors whose correction (by subtracting 15.6 hours and adding 10.5) reduced to 181.4 (186.5—5.1) the hours claimed by McLaughlin to have been spent on the litigation before the complaint was filed, warranting an award for pre-filing services of $45,-350.

**31.** No similar duplication was done by defendants' expert, Prof. Willie. The introductory paragraphs to his written testimony state, "Attached as Exhibit A is the expert report that I have previously submitted in this case, ... I do not propose to repeat the statements set forth in that report here. Rather, I incorporate the report by reference."

**32.** Unfortunately, the affidavits filed on January 3, 1997, were silent on the relevant issue of an applicable market hourly rate.

**33.** E.g., "I have concluded that Professor Willie's Report and Testimony are in many ways unsound. It includes factual errors, it misuses statistics, and its central conclusions are not supported by the best available scholarly studies. .... The reasons offered by Professor Willie as justification for the quota are amorphous and defy any standard of academic review. None of these reasons are remotely related to the issues raised in 1972 in the Morgan case."

records dating back to 1989 that in any way dealt with the 35% set-aside, including every draft of reports submitted by Prof. Willie. McLaughlin personally went through 3,183 documents. He dispatched his student assistants to various libraries throughout the city to find all the publications listed in Prof. Willie's resume and read "every book that Mr. Willie has written, including not only the three provided to me, but I read every one that I could find, because I had to be ready[34] .... We were blowing up exhibits from these books ... Those exhibits were very explosive exhibits.... Because we were taking direct quotes from Professor Willie. We wanted them the right size, the right color." For this boundless undertaking, McLaughlin logged approximately 100 hours and billed approximately $25,000.

### Unsuccessful Claims

Discussion of the second Williams factor changes the subject from exclusion of hours to reduction of time spent on claims. Plaintiff's complaint stated four substantive claims[35] in the following counts:

I—Fifth Amendment

II—Fourteenth Amendment

III—Massachusetts Statutes

VI—Scheme to Deceive

Since McLaughlin failed to delineate claims and issues with particularity, findings as to time he spent on unsuccessful claims in Counts I, III and VI must be partial. However, his application charges 9.5 hours in November and December 1995, on Count VI and 20.9 hours in March and April 1996, as spent on the cross-motion for summary judgment heard in April 1996. In that regard, plaintiff's reply memorandum, filed April 9, 1996, and signed by McLaughlin, Partlow and White, presented arguments and citations in support of all four substantive counts.

Count I claims alleged deprivation of equal rights under the Fifth Amendment by employees of the City of Boston, not of the United States. Claims under the Fifth Amendment lie only against a federal government actor:

> It has been so frequently held as not to warrant the citation of many authorities, that the first ten amendments to the Federal Constitution operate on the national government only, and were not intended to, and did not, limit the powers of the states in respect to their own people.

*Jack v. Kansas,* 199 U.S. 372, 379–80, 26 S.Ct. 73, 75, 50 L.Ed. 234 (1905); *see also Barron v. Mayor of Baltimore,* 32 U.S. 243, 247, 7 Pet. 243, 247, 8 L.Ed. 672 (1833).[36] This claim was eliminated from the case by summary judgment for the defendants granted on April 17, 1996.

Count III alleged, in purely conclusory terms, defendants' deliberate violation of unidentified statutes of the Commonwealth of Massachusetts, presumably referring to the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12 §§ 11H–11I and the Massachusetts Equal Rights Act, Mass. Gen. L. c. 93 § 102(a). Nothing in the seven exhibits attached to the complaint supports a cause of action under these sections. Nowhere in the record is there any indication of the defendants employing "threats, intimidation or coercion" against the plaintiff; and any conceivable breach of contract claim was nullified by plaintiff's enrollment at Boston Latin Academy. The only consequence of these claims was to put the defendants to the expense of researching and rebutting them. That count was also dismissed on April 17, 1996.

---

**34.** One might ask, ready for what? A bench trial on largely stipulated facts and written direct testimony before a judge who, three months before, had written a comprehensive opinion framing the legal issues. *Cf. Ackerley Communications of Massachusetts, Inc. v. City of Somerville,* 901 F.2d 170 (1st Cir.1990). "Although the legal issues were difficult, the factual background was not unduly complex and much of the relevant caselaw had been set forth by the district court." *Id.* at 172.

**35.** Two counts stated procedural claims, Count IV linking her Fourteenth Amendment claim to 42 U.S.C. § 1983 and Count V for declaratory relief under 28 U.S.C. §§ 2201 and 2202.

**36.** Historical distinctions between the Fifth and Fourteenth Amendments are discussed in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213–18, 115 S.Ct. 2097, 2105–08, 132 L.Ed.2d 158 (1995).

Count VI was a separate and distinct tort claim under common law for deceit and misrepresentation. Half of the complaint's twenty pages are devoted to a statement of defendants' alleged departures from published admissions procedures and misleading parents into believing that admissions were based upon the traditional secondary school admission test ("SSAT"), whereas the defendants had started using a different one, the independent student entrance exam ("ISEE"). This change was allegedly part of a scheme to deceive the plaintiff. So was defendants' alleged misuse of a so-called "predictor" formula thought by defendants to enhance the predictive validity of the test scores. Count VI was frequently referred to as the predictor claim.

Count VI was nugatory for two reasons: first, the essential elements of an action for deceit under the law of Massachusetts were nowhere asserted, e.g., reliance by plaintiff upon any defendant misrepresentation. *See Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir.1991); *Barrett Assoc., Inc. v. Aronson*, 346 Mass. 150, 190 N.E.2d 867 (1963). Second, plaintiff could not show "injury-in-fact" and therefore lacked standing to sue on this claim in federal court. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

Presumably for these reasons, McLaughlin agreed with defense counsel to withdraw Count VI after his letter dated November 8, 1995, which McLaughlin studied for 9.5 recorded hours during the following month. However, he neglected to file a dismissal, causing defendants to include Count VI in their motion for summary judgment, granted on April 17, 1996.

Despite the dismissal, McLaughlin repeatedly referred to the predictor claim at the December 30, 1996, hearing on fees. McLaughlin argued that inclusion of a description of the predictor formula in the report of defense witness Susan Ellerin, Ph. D., somehow conflicted with his withdrawal of the predictor claim. Defendants objected to any award for time spent on this issue, to which McLaughlin replied:

So they also raise issues about the predictor. And the one thing I will agree with them is we did agree to drop the predictor as an issue, ... providing it was not used later as a justification for the admissions policy.

They didn't need to bring the predictor back into this case. They elected to do that by basing the Ellerin report on the predictor. Pages 4, 5, and 6 of the Ellerin report deal entirely and exclusively with the predictor.

The problem with McLaughlin's argument is that it conflicts with the chronology. The time spent on the predictor issue for which he seeks compensation occurred in November 1995, weeks before Dr. Ellerin's report dated January 24, 1996. Moreover, although McLaughlin had told defense counsel that he would drop the claim, it was still pending when Dr. Ellerin filed her report. In sum, the hours challenged by the defendants were incurred by McLaughlin prior to any report by Dr. Ellerin while McLaughlin was preparing the case on his own. He alone was responsible for raising and pursuing this claim.

*Degree of Success*

The third special circumstance listed in *Williams*, no allowance for limited degree of success achieved by the plaintiff, differs from the "most critical factor" degree of success held to be "crucial" in *Hensley, supra*, which sets an objective standard. *Id.* at 436, 440, 103 S.Ct. at 1941, 1943. Being part of an inquiry to determine whether an applicant must forfeit his entire claim for compensation, this deficiency, like the good faith component of the first special circumstance, sets a subjective standard. In the instant case, was McLaughlin blameworthy for making no allowance in calculating his fee on account of limited success? That he made no such allowance is undisputed—indeed, the record of these proceedings indicates that he made no pre-application allowance of any nature at any time. The obvious predicate issue is whether plaintiff's success was in fact limited.

Plaintiff's success was limited by the dismissal of Counts I, III and VI, the only

counts asserting substantive claims which ordinarily support prayers for damages. Success on Count II, had it gone to trial, would have been restricted to injunctive relief. Should McLaughlin have recognized the vulnerability of Counts I, III, and VI and withdrawn them before April 1996, when he opposed defendants' motion for summary judgment, or even before filing the complaint? Defendants say yes and, for reasons heretofore stated, the court agrees.

Plaintiff's success was limited too by dismissal of the whole case for mootness, which McLaughlin vigorously opposed partly because he contended that Count II also included a valid claim for damages, a contention rejected by the court, but mainly because dismissal would preclude his obtaining the injunction sought in the third prayer of plaintiff's complaint "against the continued application by the defendants of any race-based discrimination, including, but not limited to, 'set asides' or quotas whether based upon prior court orders or otherwise." By vote of the School Committee on December 18, 1996, the new formula for admission to BLS became:

> Fifty percent of the seats shall be awarded to the highest ranking students based only on composite score rank order and 50% of the seats shall be awarded using composite score rank order with flexible racial/ethnic guidelines calculated based on the remaining qualified applicant pool (i.e., those who score above the 50th percentile on the entrance examination).

Thus, as summarized by defense counsel at the December 30, 1996, hearing, "The school system has not done what the plaintiff requested from the outset of this lawsuit, to become color-blind in admissions. The reason this case has been litigated was to defend that principle in this Court, and on that issue the plaintiff has not prevailed."

In preparing and submitting his invoice under § 1988, should McLaughlin have reasonably made a reduction on account of plaintiff's failure to achieve her broader goal, the one gained in March 1996, by the plaintiffs in *Hopwood v. State of Texas,* 78 F.3d 932 (5th Cir.1996), *cert. denied,* — U.S. —, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996), which held in the context of law school admissions that the defendants "may not use race as a factor"? Our best answer is a qualified affirmative: yes, because McLaughlin knew that plaintiff's only direct benefit from the litigation was her permanent enrollment at BLS and that the new admissions formula retained the use of race, albeit to a lesser extent, as a factor in examination school admissions.

The qualification to our affirmative answer is that, in compiling his application, McLaughlin was giving scant if any thought to reducing his invoice but rather contemplating reasons for increasing it. At the December 30, 1996, hearing, he argued that "the impact of this case on 300 other families, I think, is remarkable.... And I think that, if you spread out my legal fees over the 301 families that now have benefitted from this, then my legal fees are very reasonable." Without question, McLaughlin's advocacy was the catalyst for wide-ranging changes in the composition of the student bodies of the examination schools. While the constitutional issues he raised were not decided because mooted, they brought about careful consideration by defendants and greater understanding by the public. The question whether McLaughlin may reasonably claim increased compensation on account of these indirect benefits of the litigation, despite his lack of billing judgment, turns less on legal than on equitable considerations and is included under Level of Success, *infra.*

### Special Circumstances Findings

In describing the three circumstances warranting fee forfeiture, *Williams* lists them in the conjunctive, although dicta in that and other First Circuit opinions imply that the existence of a single special circumstance would support a complete denial. The court adopts and applies the conjunctive three-part test and find that McLaughlin carelessly failed to comply with any of the standards therein stated, failures aggravated by the unreliability of the hours claimed in his successive applications.

However, this finding need not be dispositive. As explained by Justice (then Chief Circuit Judge) Breyer in his dissenting opin-

ion in *Lewis v. Kendrick,* 944 F.2d 949, (1st Cir.1991) the ultimate issue in ruling on the consequences of special circumstances is whether they would render an award of fees unjust. The court does not so find, for the following reasons: (a) defendants have not sought such a finding; (b) McLaughlin did eventually rewrite his applications and correct many errors in them; (c) it might deter aggrieved citizens with limited resources from filing constitutional claims, contrary to the purpose of Congress in enacting 42 U.S.C. § 1988; (d) McLaughlin might be left without recourse with liabilities to Prof. Thernstrom and others; (e) some of the deficiencies in McLaughlin's applications were probably due to his unfamiliarity with § 1988 and decisions construing it; and (f) we credit his statement at the December 30 hearing, "I'm not trying to be greedy."

■■■ We further find that McLaughlin abdicated his responsibility to his adversary to exercise "billing judgment." See *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940; cf. *Wagenmann v. Adams,* 829 F.2d 196 (1st Cir. 1987). When this occurs, "the exercise of billing judgment becomes the court's responsibility." *Brown v. Gillette Co.,* 536 F.Supp. 113, 120 (D.Mass.1982), 224 (1st Cir.1987). "If the attorney has not exercised 'billing judgment' prior to submitting his or her fee records, then the court may do so." *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.,* 671 F.Supp. 819, 830 (D.Mass. 1987). In so doing in the instant case, the court does not ignore McLaughlin's diary entries in calculating his fee, but pays attention too to "what was done," *Ackerley,* 901 F.2d at 171–72, and what was not done, identifying those of his claimed services and hours that in our opinion were reasonably necessary under the attendant circumstances. Of course the court shall also be mindful of findings previously made in this memorandum of decision, including those previously stated in the discussion of the award to OPW.

*McLaughlin's Compensable Hours*

The reasonable value of McLaughlin's services depends on their nature and his role in the case when they were being rendered. Consistently with the changes in his role referred to in the Background section *supra,* the court has subdivided his services into four phases. Phase I ran from his first visit to the BSC offices on March 27, 1995, until September 11 when White filed his appearance. During Phase I, his principal services were investigating, drafting, and filing plaintiff's complaint and arguing her motion for a preliminary injunction. He logged a total of 250 hours[37] according to his initial application, reduced to 225 hours by the January 10, 1997, amendment, of which 40 hours were spent after filing the complaint and before OPW appeared.

Compensation for services before filing a complaint is discussed in *Webb v. Board of Education of Dyer County,* 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985), which rejected the contention that § 1988 provides for an award if the pre-filing "work was reasonably related to the enforcement of federal civil rights," *id.* at 242, 105 S.Ct. at 1928, explaining, "The Court's opinion in *Hensley* does not sweep so broadly. The time that is compensable under § 1988 is that 'reasonably expended *on the litigation.'"* *Id.* at 242, 105 S.Ct. at 1928 (emphasis in original). The Court continued,

> Of course, some of the services performed before a lawsuit is formally commenced by the filing of a complaint are performed on the litigation.' Most obvious examples are the drafting of the initial pleadings and the work associated with the development of the theory of the case.

*Id.* at 243, 105 S.Ct. at 1928. In order to recover fees for such activities, however, the work must be "both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached" successfully. *Id.*

After a thorough review of McLaughlin's invoices and supporting affidavits, the court finds the following hours compensable under

---

**37.** The hours in these findings are approximations for purposes of context and comprehensibility, but are based upon precise computations. They are not estimates unless specifically so stated.

the principles stated in *Webb:* (a) one-third of the 99 hours logged from March 27, 1995, to July 15, 1995, the date of the first diary entry indicating that he had begun drafting the complaint; (b) half of the 84 hours between July 15 and the filing of the complaint on August 11; and (c) all time claimed, 40 hours, for the 30–day period beginning August 11 until OPW appeared. *See Golden Gate Audobon Society, Inc. v. United States Army Corps of Engineers,* 732 F.Supp. 1014, 1018 (N.D.Cal.1989).

Applying the definitions of core and non-core services previously explained in connection with OPW's application, the court has studied McLaughlin's diary entries and related events in depth and finds that services reasonably requiring a total of 82 hours in periods (b) and (c) were core services and in period (a) 33 hours of non-core services.

McLaughlin's compensable hours in Phase II, which ran from OPW's appearance until August 22, 1996, when the court ordered plaintiff's admission to BLS are reduced in conformity with rulings previously made: (i) by 10 hours spent on the so-called predictor claim; (ii) by 9 hours on September 18, 19, and 20, 1995, for time spent with the press; (iii) by 13 hours, half of the 26 hours claimed by McLaughlin for time related to plaintiff's motion for reconsideration filed on September 22, 1995; and (iv) by 10 hours, half of the 20 hours claimed by him for services rendered in connection with the cross-motions for summary judgment heard on April 12, 1996. Also, (v) we have revisited McLaughlin's claim for 28.8 hours of meetings with White or Partlow not claimed in their applications and disallow 20 of those hours, partly because of the inconsistencies, but mainly because the descriptions of the meetings in McLaughlin's diaries lack sufficient detail to be compensable.

Total hours claimed by McLaughlin during Phase II were 225 initially, amended to 220. In exercising "billing judgment", we make allowance for the excessive hours listed in (i) through (iv) and disallow the 20 hours described in (v), thus reducing the total to 158.

The court finds further that all of McLaughlin's Phase II hours are fairly classified as non-core. OPW was handling the case quite capably. McLaughlin phoned and conferred and reviewed and sat in, but as the third man on a three-man team. His most significant services during this period were lining up the Suffolk Law students and collaborating with Prof. Thernstrom, an aspect of his services discussed at length *supra.* During this phase, Partlow's entries occasionally referred to McLaughlin as the client. While this was timekeeping shorthand, as Partlow explained, it nevertheless, in the court's opinion, reflected McLaughlin's essentially passive role in the conduct of the litigation while OPW was achieving the personal result sought by plaintiff. After this was accomplished, OPW had unspecified disagreements with McLaughlin who from then on was principal plaintiff counsel.

Phase III was the three-month period spent preparing for the trial that was avoided by the defendants' suggestion of mootness and consequent dismissal. McLaughlin's initial application was amended by adding 9 hours and deleting 7.7, so that the total remained practically the same: 200 hours, comprised of (a) 100 on planned cross-examination of defense expert Prof. Willie; (b) 20 revising Prof. Thernstrom's written testimony; (c) 60 preparing for and arguing plaintiff's opposition to defendants' suggestion of mootness; and (d) 20 opposing defendants' motions for postponement, drafting miscellaneous letters, conferences, and phone calls.

The court's findings as to compensable hours for services designated in (a) and (b) are based largely on findings previously discussed. Compensation is awarded for: (a) one-half the claimed 100 hours; (b) one-half the claimed 20; (c) all 60; and (d) all 20. The basis of our (c) ruling is that plaintiff's opposition to mootness was interrelated to the claim on which she prevailed, *see Lipsett v. Blanco,* 975 F.2d 934, 940–41 (1st Cir.1992) and was plausible to a point.[38] The fatal flaw in plaintiff's position was explained in the

---

38. Numerous decisions were cited in the two briefs filed by plaintiff on the mootness issue, but the court's research revealed that without exception they dealt with class actions and were therefore irrelevant.

court's Supplementary Memorandum dated December 10, 1996, as follows:

> It is critical that plaintiff chose not to cast her suit as a class action. "[T]his factor significantly affects the mootness determination." *Sosna v. Iowa,* 419 U.S. 393, 399 [95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975)] (1974). By deliberately suing only on her own behalf, plaintiff buttressed her claim for injunctive relief but laid the groundwork for defendants' mooting maneuver which deprived the Court of subject matter jurisdiction and requires that the case be dismissed. *See* Fed.R.Civ.P. 12(h)(3); *Weinstein v. Bradford,* 423 U.S. 147, 149 [96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975)] (1979). (footnote omitted)

All hours found reasonably necessary in (a), (b) and (c) were spent rendering core services. Those in group (d) were non-core.

Phase IV is the period between dismissal on November 19, 1996, and McLaughlin's filings on January 10, 1997. His initial application, like OPW's, did not seek compensation for time spent preparing it; but the amendment on January 10, 1997, claimed $7,375 for 30 hours, 23 of them after the December 30, 1996, hearing.

Generally, attorney time preparing an application is compensable. As stated by the First Circuit, "We have repeatedly held that time reasonably expended in connection with fee applications is itself compensable, but, since time spent in this exercise often amounts to little more than documenting what a lawyer did and why he or she did it,' it may fairly be compensated at a reduced rate." *Brewster v. Dukakis,* 3 F.3d 488, 494 (1st Cir.1993) (citations omitted). However, the court in this instance sustains defendants' objection to any compensation for time logged after the December 30 hearing.

But for defendants' detailed opposition to McLaughlin's application, which McLaughlin characterized as a "personal attack" upon him, he would not have had the opportunity to review and amend it, an important factor in the court's deciding against forfeiture of McLaughlin's fee warranted by the special circumstances heretofore found. But for defense counsel's complete side-by-side analysis of hours billed by plaintiff's attorneys, it is doubtful that McLaughlin would qualify for a lodestar analysis and award by the court. Also, after the January 9, 1997, hearing, defense counsel went to McLaughlin's office and joined him and his office manager-secretary in reviewing his 1996 diary and correcting errors in his initial application. In their reviews and analyses, defense counsel was doing work that should have been done by McLaughlin before December 10, 1996. Defense counsel have already been compensated by the defendants for that work. Charging the defendants for McLaughlin's time spent responding to and capitalizing on defense counsel's initiative would, in the court's opinion, be unreasonable. Hence the court's award to McLaughlin for Phase IV service is only for the 7 hours he spent through December 30, work that is classified as non-core.

### McLaughlin's Lodestar

The court's determination of a reasonable hourly rate for McLaughlin's services rests on substantially the same considerations and methodology described in ruling upon OPW's application. Its reference there to the *Blum* and *Andrade* decisions is supplemented by a further citation to *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984), in which one of the reasons for reducing an applicant's hourly rate was that he "was not a particularly experienced litigator." *Id.* at 956.

The court finds that a reasonable hourly rate for McLaughlin's services in this case is $200 for core services and $135 for non-core. "In this case" is emphasized because it does not follow or imply, nor is it suggested, that his customary fee of $250 per hour is unreasonable in his usual practice, specializing in the representation of victims of gender discrimination by financial institutions subject to federal regulation.

Summarizing, the court has classified McLaughlin's services as core for most of the hours he logged when he was sole counsel for plaintiff and lead counsel. preparing for trial; and as non-core when his services were secondary to those of his co-counsel and when he was assembling his initial application for fees. A breakdown by phases follows:

| Phase | Core | Non-core |
|-------|------|----------|
| I | 82 | 33 |
| II | — | 158 |
| III | 120 | 20 |
| IV | — | 7 |
| Totals | 202 | 218 |

McLaughlin incurred expenses to which defendants made no objection amounting to $1,086. Thus, McLaughlin's lodestar becomes $70,916, rounded to $71,000.

 Like OPW, McLaughlin advances contentions relative to lodestar enhancement, the first based on lost opportunity cost. In *Hensley*, the Supreme Court recognized Congress's consideration of twelve factors relevant to fee awards. *See* 461 U.S. at 430 n. 3, 103 S.Ct. at 1937 n. 3. The fourth factor is the "preclusion of employment by the attorney due to acceptance of the case." *Id.* When Congress enumerated the dozen considerations, it relied on the Fifth Circuit's decision in *Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714, 718 (5th Cir.1974), which noted that factor four "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken, the attorney is not free to use the time spent on the client's behalf for other purposes." *Id.*

The eleven affidavits filed on January 3, 1997, attesting to McLaughlin's customary $250 hourly fee were inadequate proof of the relevant market rate; but did indicate that he has been a busy lawyer, active in several jurisdictions. McLaughlin's circumstances differ from those of White and Partlow, who are partners in OPW; whereas McLaughlin has been a sole practitioner throughout these proceedings (he was not a partner but "of counsel" in the firm he left after filing plaintiff's complaint), unable to draw upon other attorneys' earnings. The court finds that the eleven affidavits by lawyers familiar with his work support an inference that, had he not been engaged in pursuing the instant suit, for which an hourly fee of $200 has been established, he would to some extent have been working on legal matters at his usual $250 fee. In particular, the court finds that McLaughlin suffered a $50 hourly lost opportunity cost for the 40 core hours specified in Phase I(c), *supra*, his time after filing the complaint until he hired OPW, and for one-third of the 120 core hours found compensable in Phase III(a), (b) and (c). In sum, the court finds that McLaughlin's lost opportunity cost occurred as to 80 hours, a total of $4,000, producing a modified lodestar for him of $75,000.

The grounds stated for denying fee enhancement of OPW, citing *Hall v. Ochs*, 817 F.2d 920, 929 (1st Cir.1987) and *Lipsett v. Blanco*, 975 F.2d 934, 942 (1st Cir.1992), apply *a fortiori* to McLaughlin, especially in light of the court's Special Circumstances Findings. There remains, however, another dimension of McLaughlin's application to be addressed before reaching a final conclusion, viz., the scope of plaintiff's success attributable to McLaughlin's representation. The court has already found under the subheading Degree of Success that plaintiff's success was limited in major respects. However the court also indicated, in a qualification to its discussion, that it would refer separately to McLaughlin's claim based upon the benefits this lawsuit brought to students similarly situated to plaintiff, whose applications for admission to BLS would also have been granted but for the 35% set-aside. This is part of the court's duty "to view the claims for fees in perspective. He must retain a sense of overall proportion." *Gabriele v. Southworth*, 712 F.2d 1505, 1507 (1st Cir. 1983).

### Level of Success

 The question here, again framed by *Hensley*, is whether the modified lodestar for McLaughlin "is reasonable in relation to the results obtained." *Id.* at 440, 103 S.Ct. at 1943. That it is unreasonably low is argued by McLaughlin on the basis of the defendants' concession that the instant case was the catalyst for the change in the BLS admissions formula. The problem with McLaughlin's argument is that fees under § 1988 are recoverable only for services related to issues on which plaintiffs prevail; and plaintiffs do not prevail with respect to benefits flowing from litigation to persons not parties to the lawsuit. "The touchstone

of the prevailing party inquiry must be the material alteration of the legal relationship *of the parties* in a manner which Congress sought to promote in the fee statute." *Texas State Teachers Assn. v. Garland Independent School Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989); (emphasis added) "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that *directly benefits the plaintiff." Farrar v. Hobby, supra;* (emphasis added). Moreover, until after the court's order on August 27, 1996, directing plaintiff's enrollment at BLS, Mclaughlin disclaimed advocacy for other students. He argued repeatedly that this was an individual action by one plaintiff, not a class action. He may not now recover compensation as if it were.[39] For this reason and for others previously stated, the court finds pursuant to 42 U.S.C. § 1988 that $75,000 is a reasonable attorney's fee for McLaughlin.

A discussion of the reasonableness of McLaughlin's compensation in relation to the results achieved by plaintiff in this case appears under the subheading Degree of Success, *supra,* and need not be repeated. Viewed "in perspective", both parties prevailed: plaintiff will soon start her second year at BLS and the defendants are administering the new admissions formula for the examination schools. Whether the Task Force tailored the formula narrowly enough to survive strict constitutional scrutiny, together with other issues mooted in this litigation, may be decided in another lawsuit filed in this District four days ago.

### Conclusion

On the basis of the foregoing findings of fact and conclusions of law, judgment shall enter awarding plaintiffs $75,000 for the fees and expenses of Michael C. McLaughlin, Esq., and $55,000 for the fees and expenses of O'Brien, Partlow and White, P.C.

**39.** As stated in the court's Supplementary Memorandum dated December 10, 1996, the differences between individual and class actions are of course much more than nomenclature. Class actions must comply with the complicated re-

### APPENDIX A

#### COUNT I

*Violation of Equal Rights Protection Provided by the Fifth Amendment to the Constitution of the United States*

49. Plaintiffs hereby incorporate and reallege paragraphs 1 through 49 and reallege them as if specifically set forth herein.

50. The Defendants actions in deliberately refusing to accept Julia as a result of the fact that Julia is white, violates the equal rights afforded to her under the Fifth Amendment to the Constitution of the United States. As a result of the Defendants actions, the Plaintiffs have suffered damages.

#### COUNT II

*Violation of the Fourteenth Amendment to the Constitution of the United States*

51. Plaintiffs hereby incorporate and reallege paragraphs 1 through 51 and reallege them as if specifically set forth herein.

52. As a result of the fact that Julia, a 12 year old White female, was denied admission to BLS because of her race, was wrongfully denied the equal protection provided by the Fourteenth Amendment of the Constitution of the United States. Said denial of Julia's rights has resulted from the official acts of the Defendants and the Plaintiffs have suffered damages.

#### COUNT III

*Violation of Commonwealth of Massachusetts Civil Rights Statutes*

53. Plaintiffs hereby incorporate and reallege paragraphs 1 through 53 and reallege them as if specifically set forth herein.

54. Defendants actions have been taken in deliberate violation of the Civil Rights protection afforded under the statutes of the Commonwealth of Massachusetts. As a result of Defendants actions, Plaintiffs' have suffered damages.

quirements of Rule 23, Fed.R.Civ.P.; and provisions for class certification and notification involve questions of due process of law which are inapplicable to individual actions.

## COUNT IV

### Violation of Federal Civil Rights Statutes

55. Plaintiffs hereby incorporate and reallege paragraphs 1 through 55 and reallege them as if specifically set forth herein.

56. The Defendants deliberate actions have been undertaken to deliberately violate the provisions 42 U.S.C. § 1983. The Defendant's operation or participation in the operation of the race-based classifications system described above, has been carried out under color of state law, constitutes impermissible race-based treatment of Plaintiffs' and is not justified by any compelling government interest, has violated, and continues to violate the rights of Plaintiffs in violation of 42 U.S.C. § 1983. As a result of Defendants actions, the Plaintiffs have suffered damages.

## COUNT V

### Declaratory relief under 28 U.S.C. § 2201 and § 2202

57. Plaintiffs hereby incorporate and reallege paragraphs 1 through 57 and reallege them as if specifically set forth herein.

58. The operation of the Boston Latin School admission policies under the race-based classification described above is invalid and unconstitutional. Plaintiffs seek declaratory judgment so stating.

## COUNT VI

### Deceit and Misrepresentation

59. Plaintiffs hereby incorporate and reallege paragraphs 1 through 60 and reallege them as if specifically set forth herein.

60. The Defendants have undertaken a course of action which is intended to and has deliberately deceived the Plaintiffs as to the admissions procedures that were already set in place for BLS. Such actions are part of a scheme to deceive the Plaintiffs, and as a result, the Plaintiffs have suffered damages.

WHEREFORE, THE PLAINTIFFS PRAY:

1. That this Court enter a preliminary injunction restraining the Defendants, agents, servants and all other representatives under their control from denying Julia admission to BLS for the 1995–1996 school term.

2. That this Court enter a preliminary injunction against the Defendants from undertaking any actions against the Plaintiff in reprisal for bringing this action before this Court.

3. That this Court enter a preliminary injunction against the continued application by the Defendants of any race-based discrimination, including, but not limited to, "set asides" or quotas whether based upon prior court orders or otherwise.

4. That this Court enter a preliminary injunction against the Defendants for the use of any "predictor" or any other alteration or gerrymandering of scores that are not fully disclosed to parents and students prior to the application of such formulas.

5. That this Court modify the existing Court Order so that it no longer violates the holdings of the United States Supreme Court decisions in *Adarand Constructors, Inc. v. Federico Pena*, 63 LW 4523 [515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158] (June 12, 1995); and *Missouri v. Jenkins*, 63 LW 4486 [491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229] (June 12, 1995).

6. That this Court award Plaintiffs attorneys fees under the provisions of 42 U.S.C. § 1988 and under State and common law.

7. That this Court award Plaintiffs' costs and expenses incurred in prosecuting this action.

8. That this Court grant such other and further relief as this Court deems appropriate and just.

Respectfully submitted,
JULIA A. McLAUGHLIN, A MINOR CHILD
BY HER PARENT, CATHERINE McLAUGHLIN,
By their attorney,
/s/ Michael C. McLaughlin
MICHAEL C. McLAUGHLIN, BBO # 337350
McCormack Post/Offce Building
Post Office Box 640
Boston, Massachusetts 02106–6940
617.624.7015

*APPENDIX B*

HARVARD UNIVERSITY

CHARLES WARREN CENTER FOR STUDIES IN AMERICAN HISTORY

ROBINSON HALL

CAMBRIDGE, MASSACHUSETTS 02138

(617) 495–3591

FAX (617) 496–3425

November 20, 1996

To: Michael McLaughlin

From: Stephan Thernstrom

Re: Services as Expert Witness in McLaughlin V. Boston School Committee, February–November, 1996

| | | |
|---|---|---|
| 2–10 | 6.5 | research |
| 2–11 | 7.0 | research |
| 2–13 | 7.5 | drafting critique of Willie report |
| 2–29 | 2.0 | conference with MM |
| 3–9 | 2.0 | conference with MM |
| 3–14 | 7.5 | reading new materials, drafting report |
| 3–15 | 4.0 | drafting report |
| 3–18 | 5.5 | phone with MM, revising report |
| 4–22 | 2.5 | discussing court order and drafting memo |
| 10–28 | 1.0 | phone with MM |
| 11–3 | 3.5 | meeting with MM, research |
| 11–10 | 1.75 | phone with MM, research |
| 11–11 | 5.25 | revising testimony, research |
| 11–12 | 1.0 | reviewing edited testimony, MM phone & meeting |
| 11–13 | 0.25 | phone with MM |
| 11–16 | 3.5 | reviewing Willie testimony, phone with MM |
| 11–7 | 4.25 | trial preparation |
| 11–18 | 5.25 | phone with MM; trial preparation |

70.25 hours @ $200 = $14.050

Please send payment to my home address:

1445 Massachusetts Ave.
Lexington, MA 02173
Stephan Thernstrom
Winthrop Professor of History