Daniel LaPLANTE, Plaintiff,

v.

Superintendent Peter PEPE Jr., Commonwealth of Massachusetts Department of Correction, et al., Defendants.

No. 01–10186–NG.

United States District Court,
D. Massachusetts.

Jan. 29, 2004.

Marc J. Goldstein, Palmer & Dodge, LLP, Boston, MA, George E. Olson, Palmer & Dodge, LLP, Boston, MA, for Daniel LaPlante.

William D. Saltzman, Department of Correction, Legal Division, Boston, MA, for Beverly F. Veglas, Don Stewart, Mark Powers, Peter Pepe, Sherry Elliott, Defendants.

### MEMORANDUM AND ORDER RE: ATTORNEYS' FEES

GERTNER, District Judge.

## I. INTRODUCTION

Daniel LaPlante ("LaPlante"), a state prisoner, brought this action pro se pursuant to 42 U.S.C. § 1983, and 28 U.S.C. § 1331, alleging that the defendant prison officials had interfered with his right of access to the courts. He claimed that he did not have physical access to the M.C.I.—Cedar Junction Law Library, and that he could only request legal materials by precise citation for the delivery of copies to his cell.

In the summer of 2001, this Court solicited counsel for LaPlante. The law firm of Palmer & Dodge agreed to represent LaPlante, pro bono, for which the Court is grateful. Counsel immediately filed an amended complaint, and importantly, added a claim to enforce a settlement agreement entered in a previous case, *LaPlante v. Maloney*, 96–11116–RCL (D.Mass) August 18, 1998 ("LaPlante I"). Counsel also named additional defendants.

On January 30, 2003, the Court granted plaintiff's motion for summary judgment, and ordered:

1. Defendants have infringed Mr. LaPlante's constitutional right of access to the courts and have acted with deliberate and reckless indifference to his federally protected rights.

2. In the absence of proven or quantifiable monetary damages, Plaintiff is entitled to nominal damages of $21 (one dollar for each month deprivation of legal materials access, August 2000—April 2002) from the individual defendants sued in their individual capacities.

3. Defendants are permanently enjoined from infringing Mr. LaPlante's constitutional right of access to the courts.

4. Defendants are permanently enjoined from violating the terms of the *LaPlante I* Settlement Agreement.

5. Plaintiff is the "prevailing party" in this action in the meaning of 42 U.S.C. § 1988.

6. Plaintiff's counsel is entitled to reasonable attorneys' fees and costs under 42 U.S.C. § 1988 *and* under the express terms of the *LaPlante I* Settlement Agreement.[1]

In effect, it was a complete victory for the plaintiff.[2]

Pursuant to my order, plaintiff's counsel applied for attorneys' fees. The amount requested is One Hundred Twenty–Five Thousand, Eighty–Five And 83/100 ($125,-085.83) Dollars. To the defendants, the application is "grossly excessive," for a "straight-forward access-to-court case." In short, they add, "[t]he case ... was over-litigated and over-billed."

In the light of the size of the application, and defendants' response, it is worth making a few observations at the outset, before proceeding with the more concrete analysis of plaintiff's application.

First, the defendants' position is breathtaking for its disingenuousness, to put it mildly. *Now* they imply that the issue raised by the complaint is a very simple one, stemming entirely from the *LaPlante I* Settlement Agreement.[3] *Now* they imply that the issues were straightforward: Did the defendants breach the LaPlante I Settlement Agreement or did they not? *Now* they suggest that if the plaintiff had moved for preliminary injunctive relief, at the outset, the Court would have granted it and the case would have been substantially reduced in size.

But defendants sang an entirely different tune during the course of this litigation. They refused to concede a violation, even when it was apparent in the face of a crystal clear settlement agreement from over two years ago. They refused to settle the case, even when plaintiff's counsel had apparently made overtures along those lines. Instead, they raised argument, after argument which were the prototypical "red herrings." If the case was over-litigated by any party it was the defendants. The plaintiff had no choice but to respond.

1. The Settlement Agreement entered into by the parties expressly provided, "if Mr. La-Plante is required to initiate any proceeding to enforce the agreement, and he is deemed by the Court to be a prevailing party pursuant to 42 U.S.C. § 1988, he will be entitled to receive reasonable attorneys' fees, costs, and expenses relating to that proceeding."

2. Although the plaintiff dubbed his motion as a motion for partial summary judgment, in fact, it was clear that it, together with the Court's Order, resolved all the pending issues in the case.

3. In truth, the defendants' papers engage in an interesting sleight of hand. They recite that it appears from the Court's January 31, 2003 memorandum, that *"this Court* views LaPlante's case as one that never warranted extensive litigation to achieve its ultimate resolution ..."* They do not want to concede that it was in fact a simple case, that they had over-litigated it perhaps hoping that a pro se plaintiff, or pro bono counsel, would back down. But the Court's ultimate view of the case did not drive the plaintiff's application for attorneys' fees; it was the defendants' view and the prolix pleadings it filed, to which any reasonable counsel had to respond.

As I noted in my January 31, 2003, Memorandum,

> The reprise of defendants' unconstitutional behavior is very disturbing, and their position in this litigation can only be described as obtuse. Essentially, defendants claim that if Mr. LaPlante wanted access to the law library, he had merely to agree to a 'general population' security classification. They contend that Mr. LaPlante was trying to use law library access to 'manipulate' his housing placement.

To the extent defendants' arguments are comprehensible at all, they are completely unconvincing. There was absolutely no basis for the denial of the right of access to legal materials just because LaPlante was in protective custody and not housed in general population. The constitutional right of access to legal materials is not limited to a particular housing or security arrangement. In any event, I concluded that the unconstitutional treatment of a prisoner in one site, protective custody, is never excused just because the prisoner can avoid the treatment by transferring to a site where the conditions apparently meet constitutional requirements, namely the general population. And even if the defendants thought that LaPlante was improperly claiming an entitlement to protective custody, they had a ready solution; they retained discretion to classify LaPlante over his objection.

█ Although the time spent by plaintiff's counsel was unquestionably substantial, with some exceptions noted below, it was entirely justified by the *defendants'* "over-litigated" motions and memoranda. It *was* a straightforward case and as a signatory of a settlement agreement with LaPlante, which covered these precise issues, defendants should have realized it long before the attorneys' fees petition.[4]

Second, it is true that Palmer and Dodge concluded that they needed four lawyers to staff this case—a senior associate, a mid-level associate, and a junior associate, who were supervised by a partner—which, on the surface, seems excessive. But the lawyers at Palmer and Dodge were not experienced in § 1983 litigation in general, and prison litigation in particular. As I describe below, they reasonably believed that they had to research every one of the defendants' diversionary tactics.

Palmer and Dodge would have been entirely remiss if they had not researched issues that litigators more experienced in this area would not have had to research, considered strategies that perhaps litigators more experienced in this area would have instantly rejected. In addition, staffing the case with junior lawyers made sense; had Palmer and Dodge's senior members done the research and drafting, the cost would have been even higher to the losing parties, not to mention the firm. Thus, the firm did what it was entitled to do—staff the case with lawyers whose billing rates were low and use them to "catch up" on prison law, and § 1983 issues. In submitting their bill for attorneys' fees, the firm attempted to pare it down as much as it could. Moreover, they did this while taking the risk that not a penny of their time would be compensated.[5]

---

4. By the end of their submission, defendants concede as much:

> The breach of the settlement claim required no more than asserting that the *undisputed* conditions of LaPlante's access to legal material at MCI–Cedar Junction during the pertinent period did not comport with the plain language of the settlement agreement.

> Obviously, minimal legal research and litigation was necessary to establish this claim. Indeed.

5. To the public, it may seem odd that a firm can "volunteer" to take a pro se case, and then seek attorneys fees if they win. Civil rights cases can take substantial amounts of time. Firms—especially large commercial

Due to plaintiff's counsel's inexperience in civil rights law the problem of their having to do more work than, say, a civil rights law firm would have, is simply unavoidable. The Court cast about widely to find someone, not only to represent LaPlante, but candidly, to assist the Court in resolving the case. Typically, the litigation is more efficient and more cost-effective when there are competent counsel on both sides than when one party litigates without counsel. In the vast majority of cases, the Court cannot find counsel willing to represent pro se civil rights litigants. Prisoner cases are particularly unpopular. In the instant case, lawyers with expertise in the field did not respond to the Court's request; Palmer and Dodge did. And that fact is particularly troubling because LaPlante's claims were meritorious. In awarding attorneys' fees, courts have long recognized that there may be instances in which the costs of representation may be higher where, for example, lower priced counsel is unavailable or not competent.[6]

Nevertheless, I am mindful that the defendants are a public entity and public officials, performing an essential job at a time of strained resources. It is for that reason that I have scrutinized this bill carefully, to make certain that each and every one of the legal standards have been met.

The end result·however, is still a substantial award. I am confident that the responsibility for an award of this size should be borne by defendants who flagrantly violated a two-year-old agreement, and who were represented by counsel who determined to escalate and complicate what it now agrees was a very simple case, and not by the private law firm who appropriately represented the plaintiff, as they were asked to do.

## II. LEGAL ANALYSIS

### A. Appropriateness of Fee Award

The Civil Rights Attorneys Fees Awards Act of 1976 authorizes the district court to allow the prevailing party in any Civil Rights Act suit "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. A plaintiff prevails if he has succeeded on " 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'" *Texas State Teachers Ass'n. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791–92, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–279 (1st Cir.1978)). The LaPlante settlement agreement expressly provided that plaintiff would be entitled to attorneys' fees and costs under 42 U.S.C. § 1988 if he were required to initiate any proceeding to enforce the agreement.

firms—who take cases on the Court's pro se docket do not necessarily expect to win fees, and even if they do, they surely do not expect to be compensated for anything close to their actual time and expenses. They take the cases as a service to the Court and to the public.

6. Thus in *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760 (7th Cir.1982), a district court was reversed for limiting recovery of attorneys' fees to local rates. The Seventh Circuit emphasized that the defendant had invited the use of high-priced, out-of-town counsel by its own use of similarly expensive non-local at-

torneys. Moreover, there was no finding that local counsel with the requisite expertise were available to try the plaintiffs' case. On the other hand, courts have refused to apply out-of-town rates when no "specialty" was required or when the bar of a local community could have been equal to the task. *See e.g. Guckenberger v. Boston University*, 8 F.Supp.2d 91, 104 (D.Mass.1998). *Wagenmann v. Pozzi*, 1986 WL 11754, at *3 (D.Mass. Oct.17, 1986) (assigning local Springfield, Massachusetts rates to out-of-town Boston attorneys where "several members of the local bar are well equipped to handle civil rights cases such as this one").

There is no question that plaintiff is the "prevailing party" here.

## B. *Framework for Analysis*

Essentially, the amount for attorneys' fees is determined by a two-pronged test. First, the calculation of the "lodestar figure" which is the number of hours reasonably expended multiplied by the applicable hourly market rate for legal services. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The second is an upward or downward adjustment "to account for exceptional circumstances." *Rogers v. Motta*, 655 F.Supp. 39, 43 (D.Mass.1986). One factor in determining exceptional circumstances is plaintiff's success or lack of success in the litigation. *Id.*

### 1. *The Lodestar Amount*

### a. *Reasonable Rate*

■ A reasonable rate is measured by comparing counsel's regular rates with those of the marketplace.[7]

### 2. *Hourly Rates*

Plaintiff requests hourly rates ranging from $300 per hour for Daryl Lapp, a litigation partner, $275 per hour for George Olson, a senior litigation associate, $225 per hour for Marc Goldstein, a mid-level litigation associate, to $175 per hour for John Bennet, a junior litigation associate. These are not counsel's usual rates in their commercial cases. Rather, these are arguably the rates garnered for counsel in other civil rights cases. *See Zurakowski v. D'Oyley*, 46 F.Supp.2d 87, 89 n. 2 (D.Mass.1999) (approving in-court hourly rate of $240 for one of the "foremost [civil rights] practitioners" in Massachusetts and noting that rate "ought not be taken as some emerging Massachusetts standard"); *Connolly v. Harrelson*, 33 F.Supp.2d 92, 95–96 (D.Mass.)(approving $200 per hour rate in civil rights case); *Alfonso v. Aufiero*, 66 F.Supp.2d 183, 197 (D.Mass.1999) (Saris, J.) (holding that $250 is a typical hourly rate for a senior private civil rights trial attorney in Boston); *McLaughlin ex rel. McLaughlin v. Boston Sch. Comm.*, 976 F.Supp. 53, 62 (D.Mass.1997) (Garrity, J.) (holding $200 hourly rate reasonable in civil rights action).

■ In the case of Lapp, a partner in Palmer & Dodge since 1995, and Olson, a senior litigation associate since 1994, their inexperience in civil rights cases was more than matched by their overall trial expertise. *See e.g. Visiting Nurse Ass'n v. Bullen*, 866 F.Supp. 1444 (D.Mass.1995). Therefore, I accept the rates proposed. The more junior members of the team,

---

7. As the Supreme Court noted,

   We recognize, of course, that determining an appropriate 'market rate' for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill and reputation, varies extensively—even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely. The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer's customary rate. But the fee usually is discussed with the client, may be negotiated, and it is the client who pays whether he wins or loses. The § 1988 fee determination is made by the court in an entirely different setting: there is no negotiation or even discussion with the prevailing client, as the fee—found to be reasonable by the court—is paid by the losing party. Nevertheless, as shown in the text above, the critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons.

   *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

however, are a different matter. The rates of $225 per hour and $175 per hour for Messrs. Goldstein, an associate since 1997, and Bennet, an associate since 2001, are too steep where their experience does not counterbalance their lack of expertise in the field. Accordingly, I will reduce these rates to $150 and $120 per hour. *See Wilson v. McClure*, 135 F.Supp.2d 66 (D.Mass.2001).

As the legislative history to § 1988 suggests, the purpose of fixing a reasonable hourly rate is to arrive at amounts that are "adequate to attract competent counsel, but which do not produce windfalls to attorneys." S.Rep. No. 94–1011, p. 6 (1976). Plainly, these fees are not windfalls.

### 3. *PLRA Rates v. § 1983 Rates*

Defendants claim that the plaintiff has to separate out the time spent on the breach of a settlement agreement claim and the time spent on § 1983 claims. They argue that the former time is governed by the settlement agreement, which specifies that fees will be awarded under § 1988, while the latter time, which deals with § 1983 prison litigation claims, are subject to the constraints of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C.1997e(d)(1)(A) (no more than 150 percent of the rate of lawyers appointed pursuant to 18 U.S.C. § 3006A, the Criminal Justice Act.) Plaintiffs counter that time spent on the § 1983 claims cannot be disentangled from the breach of the settlement agreement claims, and thus, the settlement agreement rate should apply.

■ In regard to defendants' position: The first question is whether the settlement agreement, which spelled out LaPlante's access to legal materials, applied to a situation in which he was in protective

custody. Defendants insisted that because LaPlante was in protective custody he was somehow not entitled to the protections of the settlement agreement: After all, he could "opt" to transfer to the general population where he would be subject to the agreement. In any event, they suggested that he was somehow using the litigation to manipulate the Department of Correction. Thus, in order to answer the most preliminary question in the litigation, counsel had to understand the agreement, the difference between protective custody and population, the Department's considerable discretion in classifying prisoners, and the constitutional protections that apply no matter how the prisoner is classified. In my judgment the § 1983 claims and the breach of contract claims are intertwined.

### 4. *Number of Hours*

A lawyer is supposed to exercise billing judgment in applying for fees. The Court is to exclude from the fee calculation hours that were not reasonably expended, including hours that were "excessive, redundant or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. A lawyer is to provide detailed and contemporaneous time records. Moreover, counsel is to distinguish between "core" and "non-core" work. *Ciulla v. Rigny*, 89 F.Supp.2d 97, 104–105 (D.Mass.2000). Core work involves legal research, etc.; non-core work is less demanding tasks, like letter-writing and telephone calls. What then comprised the hours that were "necessary," and as to those, what hours fit into the "core" versus the "non-core" category?

The amended complaint was filed on August 17, 2001. Within a month, defendants filed a motion to dismiss or in the alternative, for summary judgment, and a lengthy (over twenty page) memorandum.[8]

---

8. They made the claims described above— that LaPlante had no right to access to legal materials, except by giving the exact citation, that if LaPlante wanted to get the kind of

access that those in general population have (and the 1999 settlement agreement required), he had to move to get into general population, that LaPlante was in error when

By December 2001 LaPlante, through counsel, filed cross-motions for partial summary judgment, and responded to defendants' motion. Not surprisingly, they felt obliged to look into classification issues, protective custody questions, etc., hardly the usual fare of commercial lawyers.

Shortly thereafter, and notwithstanding the pendency of their motion to dismiss, in March of 2002 the defendants tried a new tack. They filed a motion for leave to depose LaPlante, chasing the theory that LaPlante was somehow manipulating the defendants when he claimed he had to stay in protective custody, where he did not get access to legal materials, except through the "direct citation" method.

On November 25, 2002, the Court held a hearing on the cross motions for summary judgment, and within two months granted plaintiff's motion (with one minor exception—the dismissal of defendant Larry Dubois.)

Before filing the amended complaint, counsel had no reason to believe defendants would litigate the case as they did. Thus, I will decrease by 50% the time that the plaintiff listed for preparation of the amended complaint.

Defendants' also challenge the fact that two lawyers attended hearings, consulted with one another, and went to M.C.I. Cedar Junction to interview the plaintiff. Again, it was not unreasonable for the firm to put relatively junior people on the case; the staffing was not inappropriate. Furthermore, the entries reflect little duplication of efforts.

### 5. *Degree of Success*

There is no question that this was a complete victory.

## III. *CALCULATION OF COSTS AND FEES*

### A. *Costs*

I find the costs requested to be entirely reasonable and therefore award the sum of Four Hundred Forty–Seven And 40/100 ($447.40) Dollars to plaintiff Daniel La-Plante.

### B. *Fees*

I have deducted the sum of $25,999.20 from the requested amount of $125,533.23. That deduction was made by recalculating the amount of money claimed using the adjusted hourly rates for Marc Goldstein and John Bennett, and by determining the money claimed for time worked on the case from June 14 to August 17, 2001, and reducing that sum by 50%.[9] I hereby award the sum of Ninety–Nine Thousand, Five Hundred Thirty–Four And 03/100 ($99,534.03) Dollars in total attorneys' fees to plaintiff Daniel LaPlante. (*See* Appendices "A" and "B.")

## IV. *CONCLUSION*

I hereby **AWARD** the total sum of **Ninety–Nine Thousand, Nine Hundred Eighty–One And 43/100 ($99,981.43) Dollars** in costs and attorneys' fees to plaintiff's counsel. (*See* Appendix "C.")

**SO ORDERED.**

---

he insisted that he had to stay in protective custody (and apparently, so too were the defendants when they granted him that status.)

9. In determining the number of hours claimed based on the raw data (billing invoice listing hours billed) submitted by plaintiff's counsel, this Court noticed a number of small mistakes in the totals cited in plaintiff counsel's petition [document # 61]. These discrepancies did not consistently produce either higher or lower total numbers of hours. The numbers calculated by the Court were used to determine the fees awarded.

## APPENDIX "A"

The following chart shows fees awarded only for the hours worked from June 14 through August 17, 2001. The Court has reduced by 50% the amount of fees claimed for this period.

| HOURS WORKED FROM 6/14/2001 TO 8/17/2001 | MARC GOLDSTEIN | GEORGE OLSON | DARYL J. LAPP | TOTAL WITH 50% REDUCTION |
|---|---|---|---|---|
| Core Hours | 28.3 | 51.7 | | |
| Core Hourly Rate | $ 150.00 | $ 275.00 | $300.00 | |
| Core Fees Subtotal Each | $4,245.00 | $14,217.50 | | |
| Core Fees Subtotal | | | $18,462.50 | $ 9,231.25 |
| | | | | |
| Non–Core Hours | 1.6 | 7.5 | 3.8 | |
| Non–Core Hourly Rate | $ 75.00 | $ 183.33 | $200.00 | |
| Non–Core Fees Subtotal Each | $ 120.00 | $ 1,374.98 | $760.00 | |
| Non–Core Fees Subtotal | | | $ 2,254.98 | $ 1,127.49 |
| Total Fees Subtotal | $4,365.00 | $33,458.30 | $760.00 | |
| GRAND TOTAL ATTORNEYS FEES FOR ABOVE PERIOD | | | | $10,358.74 |

## APPENDIX "B"

The following chart shows fees awarded only for the hours worked from August 18, 2001, to February 14, 2003.

| HOURS WORKED FROM 8/18/2001 TO 2/14/2003 | MARC GOLDSTEIN | GEORGE OLSON | DARYL J. LAPP | JOHN BENNETT | TOTAL |
|---|---|---|---|---|---|
| Core Hours | 130.2 | 205.1 | 7.8 | 56.7 | |
| Core Hourly Rate | $ 150.00 | $ 275.00 | $ 300.00 | $ 120.00 | |
| Core Fees Subtotal Each | $19,530.00 | $56,402.50 | $2,340.00 | $6,804.00 | |
| Core Fees Subtotal | | | | | $85,076.50 |
| | | | | | |
| Non–Core Hours | 12.5 | 13.0 | 3.5 | 1.3 | |
| Non–Core Hourly Rate | $ 75.00 | $ 183.33 | $ 200.00 | $ 60.00 | |
| Non–Core Fees Subtotal Each | $ 937.50 | $ 2,383.29 | $ 700.00 | $ 78.00 | |
| Non–Core Fees Subtotal | | | | | $ 4,098.79 |
| Total Fees Subtotal | $20,467.50 | $58,785.79 | $3,040.00 | $6,882.00 | |
| GRAND TOTAL ATTORNEYS FEES FOR ABOVE PERIOD | | | | | $89,175.29 |

## APPENDIX "C"

The following chart shows the fees awarded from Appendix A (June 14, 2001, to August 17, 2001), the fees awarded from Appendix B (August 18, 2001, to February 14, 2003), the amount of attorneys' fees requested, and the amount of attorneys' fees being awarded by the Court.

| | |
|---|---|
| TOTAL FEES REQUESTED | $125,533.23 |

| | |
|---|---|
| Core Fees from 6/14/2001 to 8/17/2001 | $ 9,231.25 |
| Non–Core Fees from 6/14/2001 to 8/17/2001 | $ 1,127.49 |
| Total Fees from 6/14/2001 to 8/17/2001 | $10,358.74 |
| | |
| Core Fees from 8/18/2001 to 2/14/2003 | $85,076.50 |
| Non–Core Fees from 8/18/2001 to 2/14/2003 | $ 4,098.79 |
| Total Fees from 8/18/2001 to 2/14/2003 | $89,175.29 |
| TOTAL FEES FROM 6/14/2001 TO 2/14/2003—GRAND TOTAL OF FEES AWARDED BY THE COURT | $ 99,534.03 |
| | |
| DIFFERENCE BETWEEN FEES REQUESTED AND ACTUAL FEES AWARDED (AMOUNT OF RE-DUCTION) | $ 25,999.20 |